22140. WHITE COUNTY BANK *v.* WHELCHEL *et al.*

DECIDED APRIL 30, 1932.

*Boyd Sloan, Sam Harben,* for plaintiff in error.

*B. F. Whelchel,* contra.

LUKE, J. The White County Bank brought an action against W. F. and F. M. Whelchel, upon a joint and several promissory note of the defendants, for $500. Upon the trial by a jury of the issues arising upon the plea and answer of the defendants, in which they set up by way of defense that they were induced to sign and deliver the note by certain alleged fraudulent misrepresentations, and that they received no benefit from the transaction, and that there was no consideration for their promise and undertaking, a verdict and judgment were rendered for the defendants. Plaintiff's motion for a new trial was overruled, and exception was taken. The motion for a new trial is based upon the usual general grounds.

The evidence disclosed that the White County Bank, in some way that does not clearly appear, was affiliated with what was known as the "Manley chain" of banks; that the failure of the Bankers Trust Company (presumedly the main institution of the affiliated banks) involved the White County Bank to the extent of $32,000, or thereabout; that the securities held by the White County Bank for that indebtedness were appraised by "the credit man from Clarence E. Allen," who classed $16,000 of the securities as perfectly good and the remainder as questionable; that this failure impaired the capital of the White County Bank, whose capital and surplus at that time aggregated about $10,000. The stockholders, or rather a large majority of them, held a meeting and agreed among themselves to a voluntary assessment of $100 per share of stock held by them. Nearly all the stockholders paid their assessments in money, a few giving their notes. Of course, the object of the stockholders was to avoid the expense and sacrifice incident to liquidation by the State Banking Department. The father of the defendants had been a stockholder to the extent of five shares. He died, leaving his estate, with these shares of stock, to

his widow during her life, with remainder to his children; and the widow was then living. Mr. Dean, the president of the plaintiff bank, and Mr. Henderson, a director and attorney, called upon one of the Whelchel brothers, gave him their explanation of the situation, told him they wished to avoid a receivership, and that "if Mr. Allen's figures were correct, we could work out of it." The Whelchels did not execute and deliver their note at that interview, but later talked with the cashier of the bank in Cleveland, Georgia, and then gave the note in question. It was the evident hope and expectation that the collection of some $16,000 from the securities pledged by the Bankers Trust Company would restore the impaired capital of the White County Bank, so as to enable it to continue its operations, and to pay the assessment on the stock to those who paid the assessments in money, and to cancel the notes of those who gave notes in lieu of money. But in this expectation the stockholders were doomed to disappointment. The bank is now in the hands of a liquidating agent.

W. F. Whelchel, one of the defendants, testified in part: "At the time I executed the first note my father was dead. My mother was the representative of that estate. I did not own any part of the stock in the White County Bank. I did not have any interest in it at that time. At the time this first note was executed I did not have any interest in my father's estate, nor at the time this note was signed. It was all left to my mother as long as she lived, and she was living. . . I never received any benefit from the note and never expected it. . . I had no interest in the estate before my mother's death. The children were to get the property after my mother's death, if anything was left. . . If there was to be any liability on my part I would have never signed the note. She still had the bank stock when she died." In his cross-examination the same witness and defendant testified in part: "I cared whether the White County Bank failed or stayed in existence because I had a little interest in it after awhile, probably. If it remained alive it was valuable and was an interest to me." F. M. Whelchel, codefendant, testified in part: "At the time this first note was signed this stock belonged to my mother, and I had no interest in it whatever. My father left his property to my mother, to do as she pleased with it during her life. . . If there was any liability on my part I would have never signed the note." The

foregoing portions of the testimony of the defendants appear to be substantially all that is pertinent and material to the question whether there was any consideration, in legal contemplation, for the execution and delivery of the promissory note upon which the action is founded. It is obvious that, in their capacity as remaindermen, both defendants were interested in the estate of their father, and that the five shares of stock which the defendants were endeavoring to protect by the execution and delivery of their promissory note were part of that estate. One of the defendants frankly admitted that the matter of the failure or of the continued existence of the bank was of interest to him, and, "if it remained alive it was valuable and was an interest to me." The defendants intended that their note, together with the voluntary assessments paid into the bank, and, perhaps, other notes given in lieu of such cash payments of assessments, should be used in the effort to enable the bank to continue its operations. Nothing to the contrary appearing, it must be assumed that their note was so used. Can it be doubted, in these circumstances, that there was a valuable consideration to support their promise evidenced by their note? We think not. To decide the question otherwise would tend to destroy the stability of ordinary commercial transactions. So, upon the evidence of the defendants themselves, we hold that the defense of failure of consideration was not available in this case.

Passing to the defense that the defendants were induced to execute and deliver their note by fraudulent representations, which they believed to be true and upon which they relied and acted: W. F. Whelchel testified in part: "They wanted me to give this note because they wanted to establish a new independent bank and wanted to make a showing, and it would never cost us nothing, they said. Mr. Dean was present. I knew Mr. Dean was president. They did not tell us in what capacity they were acting, said he just wanted to make a showing, and I was to never pay the note. . . They told me to get my brother Ferd and go to Cleveland and give the note. I went up there and Ferd was with me. He is the other defendant. Mr. Mauney explained what it was—just about like they had—just to establish the bank—nothing to it but accommodation paper. I don't know whether or not a new bank was established. I guess it was." In his cross-examination he testified in part: "They were doing that for the purpose of establishing

a new bank. It got out of that chain and established an independent bank. So far as I know, all that was true. I do not pretend that any part of that is false. . . Nothing was said by Mr. Dean or Mr. Henderson that was not true, except that they are trying to collect this note. . . I might have had time to investigate in the meantime if I was mind to. I made no effort to investigate. Nothing they told me was untrue. After this note was signed the bank continued to operate. I reckon it continued to operate in Cleveland. I never knowed no more about it. . ."
F. M. Whelchel, upon cross-examination, testified in part: "At the time we went to Mr. Mauney to execute this note, and he told us about the condition of the bank and about Manley's default, he told us that the notes would be automatically taken care of as the collections came in. He told us that some of the Manley paper was good. He told us that that would take care of our note and the other notes, and that they would not have to be paid. Everything that he or any of them told us was true except that they are trying to collect this note. There was no misrepresentation except that one thing."

There are two sound reasons, in our opinion, why the defendants in this case are not entitled to avail themselves of the defense that they were induced to execute and deliver their note by fraudulent representations believed by them to be true and acted upon in good faith. First, under well-established rules of law, their unconditional promise in writing to pay a certain sum at a certain time could not, in the absence of fraud, be defeated by proof of any contemporaneous oral agreement or understanding that they would not be required to discharge their promise. Second, the evidence of the defendants, taken to be true, is wholly insufficient to establish the defense that they were induced by fraudulent representations to give their note. It is evident, from their testimony, that the representations of Mr. Dean, Mr. Henderson, and Mr. Mauney were mere expressions of their honest opinions. In their very nature, statements touching the value of collateral securities and their collectibility, and the future results of the operation of an already insolvent bank, were not such representations as these defendants, as men of reasonable minds and judgments, were entitled to "pin their faith" upon. We class such statements as mere predictions, the realization of which is inevitably the more earnestly

to be hoped for than certainly to be expected. In the last analysis, every case of this character must be decided with reference to its own facts and circumstances.

We hold that the verdict was contrary to law and without sufficient legal evidence to support it; and, therefore, the verdict and the judgment entered thereon must be set aside and a new trial awarded.

*Judgment reversed. Broyles, C. J., and Jenkins, P. J., concur.*