## A11A1553. GREENWALD v. ODOM et al.

(723 SE2d 305)

BARNES, Presiding Judge.

This is a securities fraud action in which the trial court granted summary judgment in favor of three corporate officers of Verso Technologies, Inc., a now-defunct telecommunications company, on all of the claims brought against them by E. K. Greenwald in connection with his purchase of Verso stock and stock warrants in 2007. Greenwald appeals from the order granting summary judgment, contending that there are genuine issues of material fact over whether the defendants made actionable misrepresentations and omissions in connection with his purchase of the stock and stock warrants. For the reasons discussed below, the trial court did not err in granting summary judgment to the defendants on Greenwald's claims pertaining to an alleged oral misrepresentation made about accounts payable and certain alleged omissions in the stock subscription materials. But the trial court erred in granting summary judgment to the defendants on Greenwald's claims pertaining to alleged oral misrepresentations about a revenue forecast and about the future sale of one of Verso's divisions. In light of this error, we vacate in part the trial court's order granting summary judgment, and we remand for the trial court to determine two issues raised by the defendants but not ruled upon in the court below: whether Greenwald's expert testimony regarding causation was admissible and, if so, whether it established a genuine issue of material fact on the issue of loss causation.

On appeal from the grant of summary judgment, we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmoving party. *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997). So viewed, the record shows that Verso Technologies, Inc., was a publicly traded telecommunications company that specialized in "providing next-generation network solutions to carriers, enterprises, governments and government related entities." Verso had a history of operating losses and made efforts to raise additional capital through private stock subscriptions in the summer of 2007.

*The Purchase Transaction.* In August 2007, Greenwald purchased restricted stock and stock warrants in Verso through a private subscription for the price of $2,040,000 (the "Purchase Transaction"). At the time of the Purchase Transaction, Steven A. Odom was Verso's chair and chief executive officer, Mark Dunaway was its chief operating officer, and Martin Kidder was its chief financial officer.

*The Offering Documents.* Before the Purchase Transaction, Kidder assisted in preparing a Confidential Information Memoran-

dum, a Subscription Agreement, and a Subscriber Questionnaire (collectively, the "Offering Documents") which he then furnished to Greenwald and other potential private investors. Section 9 of the Subscription Agreement provided:

> This Subscription Agreement contains the entire agreement of the parties with respect to the matters set forth herein and there are no representations, covenants or other agreements except as stated or referred to herein or as are embodied in the Offering Documents. (Hereinafter, the "Merger Clause.")

Notably, however, a separate section of the Subscription Agreement, entitled "Reliance," stated:

> The Company [Verso] has made available to the Subscriber [Greenwald] the opportunity to ask questions of, and receive answers from the Company with respect to the activities of the Company as described in the Offering Documents, and otherwise to obtain any additional information, to the extent that the Company possesses the information or could acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information contained in the Offering Documents. The Subscriber . . . is entering into this Subscription Agreement relying solely on the facts and terms set forth in the Offering Documents or as contained in documents or answers to questions so furnished to the Subscriber, and neither the Company nor its representatives have made any other representations or provided any other information of any kind or nature, whether written or verbal, to induce the Subscriber to enter into this Subscription Agreement or in connection with the Subscriber's investment in the Securities. (Hereinafter, the "Reliance Clause.")

The Subscription Agreement also required Greenwald to expressly acknowledge certain risks. Among other things, the Subscription Agreement stated that the purchase of the securities was a speculative investment and involved a high degree of risk; that there was no market for the securities, currently or in the foreseeable future; that Verso's operations were dependent on its ability to secure additional financing; and that there were "no existing arrangements with respect to such financing."

Similarly, the Confidential Information Memorandum contained several pages articulating risks associated with the purchase. The

risk factors included that Verso's common stock might be delisted from NASDAQ; Verso might be unable to fund future growth; Verso had a history of losses and might not be profitable in the future; Verso's need to invest in research and development could harm its operating results; Verso's focus on emerging markets could make achievement of its sales goals more difficult; and Verso derived from channel distribution partners a substantial amount of its revenues, which might decline significantly if any major partner were to cancel or delay a purchase of Verso's products.

Finally, the Confidential Information Memorandum incorporated by reference several financial documents, including Verso's Form 10-K report to the Securities and Exchange Commission ("SEC") for the year ending December 2006 and its Form 10-Q reports to the SEC for the quarters ending March 31, 2007 and June 30, 2007.

*The August 20, 2007 Meetings.* After receiving the Offering Documents, on August 20, 2007, Greenwald met separately with COO Dunaway and with CEO Odom to obtain additional information about Verso's business prospects and the investment opportunity presented by the private offering. The two meetings were held in Atlanta at Verso's offices. According to Greenwald, three material oral misrepresentations were made to him during the August 20, 2007 meetings: (a) a misrepresentation by Dunaway regarding a 2008 revenue forecast; (b) a misrepresentation by Odom regarding the future sale of Verso's NetPerformer division in the fourth quarter of 2007; (c) and a misrepresentation by Odom regarding the aging status of Verso's accounts payable. Each of these alleged misrepresentations will be discussed in turn.

(a) *The 2008 Revenue Forecast.* During Greenwald's meeting with Dunaway, a 2008 revenue forecast was presented to Greenwald that was written on a whiteboard with information broken down quarter by quarter, customer by customer, and contract by contract. According to Greenwald, in response to his questions about the revenue forecast, Dunaway represented that it was based on "contracts in hand," and that these existing contracts added up to $75 million in revenue for Verso that was "essentially baked in" even if no additional sales were made in 2008. Based on this representation, Greenwald believed that although Verso had never had a profitable quarter, it would be able to "get on [its] feet" and turn its financial situation around.

Deposition testimony, however, painted a different picture concerning what formed the basis for the 2008 revenue forecast presented to Greenwald. In his deposition, CFO Kidder testified that Verso's revenue forecasts were prepared by Verso's "finance group" under his supervision, with the forecast information then circulated

to senior management, including Dunaway. Kidder testified that the revenue forecasts were not based "on contracts for sales in hand." Rather, the forecasts were based merely on "pipeline information," or "opportunities that are in play," which encompassed "opportunities that the sales folks are pursuing . . . [that] are at various stages of completion and have various probabilities."

(b) *The Future Sale of NetPerformer.* During his separate meeting with Odom, Greenwald expressed his concern over the fact that Verso had certain large long-term debt obligations coming due in 2008. Odom responded that Verso's payment of these long-term debt obligations would be "taken care of" through the sale of Verso's NetPerformer division in the fourth quarter of 2007 for the purchase price of $20 million to $25 million. According to Odom, the NetPerformer division was "state of the art." He indicated that Verso was currently in negotiations with a specific unnamed buyer over the terms of the sale of the NetPerformer division, that the sale was "all but a done deal," and that a second unnamed buyer was "standing in the wings" if for any reason the deal did not go through with the first buyer. Greenwald knew that if Verso did not address its long-term debt obligations it likely would go bankrupt, but he believed that Verso would meet its obligations based upon the representations of Odom regarding the imminent sale of the NetPerformer division.

Again, deposition testimony painted a different picture of the status of the future sale of the NetPerformer division. In his deposition, Odom testified that he did not believe that there were any negotiations with a specific buyer over the sale of the NetPerformer division in August 2007. Moreover, Odom testified that by no later than mid-August 2007, Verso had discovered significant hardware failures in the NetPerformer product such that additional re-engineering work would need to be done "to get NetPerformer back to where [he] thought it could be sold."

(c) *The Aging Status of Verso's Accounts Payable.* Also during his meeting with Odom, Greenwald inquired about the nature and size of Verso's debt. Odom responded that other than the long-term debt obligations already disclosed to Greenwald, "there was nothing but the normal, daily, operational type debts, rent, payroll, accounts payable month-to-month." But Greenwald testified by way of deposition that after the Purchase Transaction was completed, he learned from one of Verso's board members that the company had significant outstanding accounts payable that were long overdue.

*Verso's Bankruptcy and the Ensuing Litigation.* After his meetings with Dunaway and Odom, Greenwald executed an acknowledgment of the terms of the Offering Documents, and the Purchase Transaction was consummated in late August 2007. According to Greenwald, he would not have made the stock purchase without the

representations made to him at the August 20, 2007 meetings, which led him to believe that Verso would be able to meet its outstanding long-term debts in the fourth quarter of 2007 and would have a solid base of sales revenue in the following year.

Instead, Verso failed to sell its NetPerformer division in the fourth quarter of 2007, and the projected revenues for 2008 did not materialize. In April 2008, Verso's stock was delisted from NASDAQ, and Verso filed for bankruptcy. Verso's assets were liquidated as part of the bankruptcy proceedings, and Greenwald lost his entire investment in the restricted stock and stock warrants. The restrictions on Greenwald's stock had never been lifted and the stock had never become tradeable on any public market before the bankruptcy.

Greenwald sued Odom, Kidder, and Dunaway for securities fraud under the former version of the Georgia Securities Act of 1974,[1] common law fraud, and common law negligent misrepresentation in connection with the Purchase Transaction. He did not name Verso as a party to the lawsuit in light of its bankruptcy and subsequent liquidation.

In his complaint, Greenwald alleged that Dunaway made material misrepresentations about Verso's projected 2008 revenue, and that Odom made material misrepresentations about the status of Verso's negotiations over the sale of the NetPerformer division and about the current state of Verso's debt, during the meetings he had with them on August 20, 2007. He further alleged that the Offering Documents omitted material information about Verso's risk of losing its NASDAQ listing and about the imminent risk of Verso's insolvency, and that Kidder could be held liable for these omissions because he had assisted in preparing those documents. According to Greenwald, he relied on these misrepresentations and omissions in his decision to participate in the Purchase Transaction.

Also in his complaint, Greenwald unconditionally tendered his Verso stock and stock warrants to the defendants in an effort to rescind the Purchase Transaction, and he sought the return of his purchase price. He requested punitive damages and attorney fees as well.

*Summary Judgment.* The defendants answered and, after discovery, filed a motion for summary judgment on the grounds that the alleged oral misrepresentations by Dunaway and Odom were generalized statements regarding future events that could not form the basis for a fraud claim and, in any event, Greenwald's claims were

---

[1] Effective July 1, 2009, the Georgia Securities Act of 1974 was amended and became known as the "Georgia Uniform Securities Act of 2008." See OCGA § 10-5-1; Ga. L. 2008, p. 381, § 1. Because the Purchase Transaction occurred before July 1, 2009, Greenwald relied upon the provisions of the former Georgia Securities Act of 1973 to support his securities fraud claims.

barred by the Merger Clause in the Subscription Agreement. The defendants also argued that the Offering Documents were not materially misleading regarding the risk of NASDAQ delisting and Verso's insolvency, and that Greenwald had presented insufficient evidence that the alleged misrepresentations and omissions proximately caused his economic loss. Additionally, the defendants moved to exclude the testimony of Greenwald's expert, who, among other things, opined on matters relating to causation and damages.

The trial court granted the defendants' motion for summary judgment. In its order, the trial court concluded that Greenwald could not have justifiably relied on the alleged oral misrepresentations regarding the 2008 revenue forecast and the sale of the NetPerformer division because they were merely predictions of future acts or events. The court further concluded that the alleged oral misrepresentation regarding the aging status of Verso's accounts payable was immaterial as a matter of law in light of the disclosures made in Verso's SEC filings and in the Offering Documents. Moreover, the trial court concluded that reliance upon any of the alleged oral misrepresentations was unjustified in light of the Merger Clause in the Subscription Agreement. As to the alleged omissions in the Offering Documents, the trial court concluded that the documents sufficiently disclosed the risks of NASDAQ delisting and insolvency and thus were not materially misleading. The trial court did not rule upon the issue of proximate cause or damages, and the court held that, in light of its summary judgment ruling, the issue of whether Greenwald's expert testimony was admissible had been rendered moot and would not be addressed.

Greenwald now appeals from the trial court's summary judgment order. On appeal from the grant of summary judgment, we conduct a de novo review of the law and the evidence. *Richardson v. Phillips*, 302 Ga. App. 305 (690 SE2d 918) (2010). "A party is entitled to summary judgment only if he can demonstrate that there is no dispute as to any material fact and that the party is entitled to judgment as a matter of law." *Sprint Transport Group v. China Shipping NA Agency*, 302 Ga. App. 369, 370 (691 SE2d 265) (2010). See OCGA § 9-11-56 (c). In deciding whether a genuine issue of material fact exists, we "must view all evidence and inferences to be drawn from the evidence in the light most favorable to the nonmoving party, and all reasonable doubts must be resolved in the nonmoving party's favor." Id.

OCGA § 10-5-12 (a) (2) of the former Georgia Securities Act of 1974 provides in relevant part:

It shall be unlawful for any person . . . [i]n connection with an offer to sell, sale, offer to purchase, or purchase of

> any security, directly or indirectly: (A) To employ a device, scheme, or artifice to defraud; (B) To make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (C) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon a person.

OCGA § 10-5-12 (a) (2) (2007).

We have held that "common law and securities fraud under former OCGA § 10-5-12 (a) require the same elements." (Citation and punctuation omitted.) *Griffin v. State Bank of Cochran*, 312 Ga. App. 87, 93 (1) (b) (718 SE2d 35) (2011). And common law fraud requires proof

> (1) that the defendant made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the plaintiff; (4) that the plaintiff justifiably relied on such representations; and (5) that the plaintiff sustained the alleged loss and damage as the proximate result of their having been made.

(Punctuation and footnote omitted.) *GCA Strategic Investment Fund v. Joseph Charles & Assocs.*, 245 Ga. App. 460, 463-464 (3) (537 SE2d 677) (2000). Similarly, negligent misrepresentation requires proof of "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." (Punctuation and footnote omitted.) *Hendon Properties v. Cinema Dev.*, 275 Ga. App. 434, 439 (2) (620 SE2d 644) (2005). With this legal framework in mind, we turn to the enumerations of error raised by Greenwald on appeal.

1. Greenwald contends that the trial court erred in concluding that he could not have justifiably relied on the alleged oral misrepresentations regarding the 2008 revenue forecast and the future sale of the NetPerformer division in 2007 because they were merely predictions of future acts or events. We agree with Greenwald that the trial court erred.

Under Georgia law, it is well settled that

> [m]ere opinions, predictions, and conjectures relating to future events cannot form the basis of a fraud claim. It is axiomatic that a false representation made by a defendant, to be actionable, must relate to an existing fact or a past

event. Fraud cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events. Representations concerning expectations and hopes are not actionable.

(Citations and punctuation omitted.) *Infrasource v. Hahn Yalena Corp.*, 272 Ga. App. 703, 707 (2) (613 SE2d 144) (2005). But "[a]n exception to this general rule exists where the promisor knows, at the time of the misrepresentation, that the future event will not take place." *Pacrim Assocs. v. Turner Home Entertainment*, 235 Ga. App. 761, 767 (3) (510 SE2d 52) (1998). Furthermore, false representations of existing or current facts are actionable even if combined with promises as to future events. See *Castleberry v. Wells*, 183 Ga. 328, 335 (2) (188 SE 349) (1936) (misrepresentation concerning defendant's financial solvency was actionable even if combined with promise of something to occur in the future); *Golden Atlanta Site Dev. v. Nahai*, 299 Ga. App. 646, 651 (2) (a) (683 SE2d 166) (2009) (defendants' misrepresentations that their real estate development company owned the property, had the right to develop it, and had the right, power, and authority to enter into an investment contract with respect to that property were actionable statements of current fact even though combined with future promise that the defendants "planned to develop a shopping center on commercial property"); *Bishop v. Greene*, 62 Ga. App. 126, 129-130 (8 SE2d 448) (1940) (in connection with future promise, defendant made actionable misrepresentations concerning company's financial worth, freedom from debt, and ownership of certain assets).

Here, the first representation at issue was Dunaway's 2008 revenue forecast of $75 million. Interwoven with this forecast was the alleged misrepresentation that the projection was based on "contracts in hand." As such, a jury could find that the forecast included an actionable false statement of an existing fact that was intended to induce Greenwald to enter into the Purchase Transaction.[2] See *Castleberry*, 183 Ga. at 335 (2); *Golden Atlanta Site Dev.*, 299 Ga. App. at 651 (2) (a); *Bishop*, 62 Ga. App. at 129-130.

The second representation at issue was Odom's statement that there would be a sale of the NetPerformer division for $20 million to $25 million in the fourth quarter of 2007. Interwoven with this

---

[2] In the trial court, Greenwald also argued that Dunaway falsely predicted that Verso's revenue in the fourth quarter of 2007 would be at least $15 million and that Verso's future earnings before interest, taxes, depreciation, and amortization would be neutral or positive. Greenwald failed to sufficiently tie these future financial predictions to a false statement of current fact about Verso. Accordingly, the trial court was authorized to rule, as a matter of law, that Greenwald was not justified in relying upon these mere projections and conjectures about Verso's future financial performance. See *Infrasource*, 272 Ga. App. at 707 (2).

statement was the alleged misrepresentation that a sale currently was in discussion with a specific buyer. Again, a jury could find that the prediction regarding the future sale included an actionable false statement of a current or existing fact that was designed to induce Greenwald to enter into the Purchase Transaction. See *Castleberry*, 183 Ga. at 335 (2); *Golden Atlanta Site Dev.*, 299 Ga. App. at 651 (2) (a); *Bishop*, 62 Ga. App. at 129-130. Moreover, Greenwald presented evidence from which a jury could find that when Odom made his statement regarding the future sale, he knew that NetPerformer was experiencing serious hardware failures that precluded a sale from actually occurring. Thus, a jury also could find that Odom knew, at the time of his representation regarding the sale of the NetPerformer division, that the future sale would not take place in the fourth quarter of 2007. See *Pacrim Assocs.*, 235 Ga. App. at 767 (3).

Under these circumstances, the trial court erred in concluding that the two oral misrepresentations were not actionable because they were merely predictions of future acts or events.[3] Nevertheless, the defendants contend that Greenwald could not have justifiably relied on the misrepresentations in light of the express warnings and risk factors set forth in the Offering Documents.

Their contention fails for two reasons. First, as explained infra in Division 4 (b), Greenwald was entitled to rely upon the oral representations made to him during the August 20, 2007 meetings pursuant to the express language of the Reliance Clause contained in the Subscription Agreement. Compare *Novare Group v. Sarif*, 290 Ga. 186, 190 (3) (718 SE2d 304) (2011) (reliance upon oral misrepresentations precluded by, among other things, comprehensive merger clause and express disclaimer in which purchasers affirmed that they were not relying upon any representations or statements of brokers). Second, general cautionary or risk-disclosing language contained in documents supplied as part of the sale of securities does not automatically neutralize specific misstatements or omissions of fact made to the purchaser. See, e.g., *Findwhat Investor Group v. Findwhat.com*, 658 F3d 1282, 1299 (II) (B) (1) (11th Cir. 2011); *In re Westinghouse Securities Litigation*, 90 F3d 696, 709-710 (III) (3d Cir.

---

[3] This case is factually distinguishable from *White County Bank v. Whelchel*, 45 Ga. App. 229 (164 SE 66) (1932). In that case, we concluded that representations made by a bank's principals regarding the collectibility of certain collateral securities and the future results of the operation of the bank were not actionable because they were "mere predictions." In reaching this conclusion, we explained that the uncontroverted testimony of the bank's principals showed that their predictions were nothing more than "expressions of their honest opinions." Id. at 232. In contrast, there is evidence in the present case from which a jury could find that the oral representations about the 2008 revenue forecast and about the future sale of the NetPerformer division included statements of current fact that Dunaway and Odom knew were false.

1996); *Gray v. First Winthrop Corp.*, 82 F3d 877, 884 (9th Cir. 1996).[4] Compare *Novare Group*, 290 Ga. at 189 (2) (purchaser could not reasonably rely upon oral misrepresentation directly contradicted by the specific language of the parties' written agreement).

The warnings and risk factors disclosed in the Offering Documents were not specifically tailored to the representations concerning the 2008 revenue forecast or to the future sale of the NetPerformer division upon which Greenwald relied. Hence, a jury could find that the warnings and risk factors set forth in the Offering Documents were not sufficiently cautionary to warn against the dangers of relying on the particularized information supplied to Greenwald during the August 20, 2007 meetings. As we have emphasized, whether a party justifiably relied on an alleged misrepresentation is normally for the jury, see *Potts v. UAP-GA AG CHEM*, 256 Ga. App. 153, 156 (1) (567 SE2d 316) (2002), and we see no reason to deviate from that rule with respect to the misrepresentations at issue here.

2. Greenwald also contends that the trial court erred in concluding that the alleged oral misrepresentation regarding the aging status of Verso's accounts payable was immaterial as a matter of law. We disagree with Greenwald.

Notably, Greenwald does not challenge the accuracy of the *size* of the accounts payable set forth in the consolidated balance sheets provided in Verso's Form 10-K for 2006 or in the Form 10-Q reports for the quarters ending March 31, 2007 and June 30, 2007 that were incorporated by reference into the Confidential Information Memorandum. Rather, his contention is that the particular *age* of the accounts payable was not properly disclosed to him.

"An action for fraud cannot be sustained when based upon alleged misrepresentations which are immaterial[.]" (Citation and punctuation omitted.) *Parrish v. Jackson W. Jones, P.C.*, 278 Ga. App. 645, 649 (2) (b) (629 SE2d 468) (2006). "[A] fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice or action in the transaction in question." *McKesson Corp. v. Green*, 299 Ga. App. 91, 94 (1) (683 SE2d 336) (2009). See *Floyd v. Morgan*, 62 Ga. App. 711, 716 (9 SE2d 717) (1940). In the context of securities fraud, "a misrepresentation or omission is material if and only if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly

---

[4] We look to the federal law of securities fraud as persuasive authority when addressing securities fraud under Georgia law. See, e.g., *Holmes v. Grubman*, 286 Ga. 636, 641-642 (2) (691 SE2d 196) (2010); *GCA Strategic Investment Fund*, 245 Ga. App. at 464 (3).

altered the 'total mix' of information made available." (Citation and punctuation omitted.) *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F3d 1153, 1173 (V) (11th Cir. 2008). See *Basic Inc. v. Levinson*, 485 U. S. 224, 231-232 (II) (108 SC 978, 99 LE2d 194) (1988); *Flexible Products Co. v. Ervast*, 284 Ga. App. 178, 181 (2) (a) (643 SE2d 560) (2007).

Greenwald has failed to show that there is a substantial likelihood that disclosure of the specific age of a company's accounts payable would have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available, when the investor already had accurate information available to him about the current size of the company's outstanding accounts payable. Consequently, the trial court did not err in concluding that Odom's alleged failure to disclose the aging status of Verso's accounts payable was immaterial as a matter of law. See *Parrish*, 278 Ga. App. at 649 (2) (b).

3. Greenwald further contends that the trial court erred in concluding that the alleged omissions in the Offering Documents were not materially misleading. In this respect, he argues that the Offering Documents failed to sufficiently disclose that Verso was at risk of losing its NASDAQ listing because of a failure to meet the minimum shareholder's equity requirement or that Verso faced an imminent threat of insolvency. We are unpersuaded that the trial court erred in this regard.

In the section entitled "Risk Factors," the Confidential Information Memorandum expressly warned in bold, italicized language: "The Common stock may be delisted from The Nasdaq Capital Market." It went on to disclose that Verso's common stock was currently quoted on NASDAQ, but that Verso was required to "satisfy certain minimum listing maintenance requirements to maintain such quotation, including a series of financial tests relating to shareholders equity . . . and maintaining a minimum bid price of $1.00 per share for the Common Stock." The Confidential Information Memorandum also disclosed the existence of the only notice that Verso had received from NASDAQ concerning its failure to comply with the exchange's listing requirements, which addressed Verso's failure to maintain the minimum bid price for its common stock.

With respect to the risk of insolvency, the Subscription Agreement noted that the purchase of the securities was a speculative investment and involved a high degree of risk, and that Verso's operations were dependent on its ability to secure additional financing and that there were "no existing arrangements with respect to such financing." The Confidential Information Memorandum disclosed that "as of June 30, 2007, [Verso] had an accumulated deficit of approximately $361.2 million," that Verso might be unable to fund

future growth, and that Verso had a history of losses and might not be profitable in the future.

In light of these disclosures in the Offering Documents, Greenwald cannot show that there is a substantial likelihood that the disclosure of additional facts in the Offering Documents regarding NASDAQ delisting or the risk of insolvency would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. In fact, Greenwald conceded in his deposition that, with respect to the Offering Documents, "I probably wouldn't have said any more" regarding the degree of risk involved. The trial court was authorized to conclude that the alleged omissions in the Offering Documents were not materially misleading as a matter of law.

4. Greenwald contends that the trial court erred for two reasons in concluding that the Merger Clause in the Subscription Agreement barred him from relying upon the alleged oral misrepresentations made to him at the August 20, 2007 meetings.[5] First, Greenwald argues that he elected to rescind the Subscription Agreement and thus is not bound by the Merger Clause. Second, he argues that he was entitled to rely upon the oral misrepresentations in light of the Reliance Clause in the Subscription Agreement. We will address the two arguments separately.

(a) We conclude that Greenwald was not entitled to rescind the Subscription Agreement because none of the defendants were parties to that agreement. Under the common law, the remedy of rescission is available only between parties who are in privity of contract. See *Sofet v. Roberts*, 185 Ga. App. 451, 452-453 (3) (364 SE2d 595) (1987). Consequently, no claim for common law rescission can lie in an action brought solely against corporate officers who were not parties to the contract sought to be rescinded. See Fletcher Cyclopedia of the Law of Corporations, § 5595. This follows from the principle that "[t]o effect a complete rescission, all the parties must be returned as nearly as possible to the status quo ante," *GCA Strategic Investment Fund*, 245 Ga. App. at 463 (1), a result that is not possible when none of the defendants were among the contracting parties.

Nevertheless, Greenwald contends that he was entitled to re-

---

[5] We have held that an agent of a contracting party can rely upon a merger clause contained in the contract to preclude claims against the agent for his or her alleged representations made before formation of the contract. See *Tampa Bay Finance v. Nordeen*, 272 Ga. App. 529, 534 (2) (612 SE2d 856) (2005); *Yee v. Barnwell*, 193 Ga. App. 820, 822-823 (1) (389 SE2d 392) (1989). Compare *Textile Rubber &c. Co. v. Thermo-Flex Technologies*, 308 Ga. App. 89, 97 (2) (b) (706 SE2d 728) (2011) (defendant could not rely upon disclaimer provision where he was "not simply acting as an agent" for the corporate defendant, but also served as a consultant and expert to the corporate plaintiff that relied upon his representations).

scind the Subscription Agreement against the defendants pursuant to the former Georgia Securities Act of 1974, OCGA § 10-5-14 (a) and (c) (2007). That statute provides in relevant part:

> (a) Any person who violates subsection (a) of Code Section 10-5-12 [by committing securities fraud] shall be liable to the person buying such security; and such buyer may sue in any court of competent jurisdiction to recover the consideration paid in cash (or the fair value thereof at the time the consideration was paid if such consideration was not paid in cash) for the security with interest thereon from the date of payment down to the date of repayment . . . (less the amount of any income received thereon), together with all taxable court costs and reasonable attorney's fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security. . . .
>
> . . .
>
> (c) Every person who directly or indirectly controls a person liable under subsection (a), (b), or (h) of this Code section, every general partner, executive officer, or director of such person liable under subsection (a), (b), or (h) of this Code section, every person occupying a similar status or performing similar functions, and every dealer, limited dealer, salesman, or limited salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the person whose liability arises under subsection (a), (b), or (h) of this Code section unless the person whose liability arises under this subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist. There is contribution as in the case of contract among several persons so liable.

OCGA § 10-5-14 (a), (c) (2007). Greenwald contends that these provisions authorize a buyer to tender back the security and recover the consideration paid for it without imposing any requirement that the person liable for the payment (either directly or jointly and severally) be a party to the contract or the seller or issuer of the security.

We agree with Greenwald's reading of OCGA § 10-5-14 (2007) with respect to who can be held liable for paying back the consideration owed the purchaser, but it does not follow from that reading that the statute authorizes a complete rescission as understood by

the common law. Subsection (a) of the statute does not use the word "rescission" or "rescind" and is silent as to the circumstances under which the underlying contractual agreements remain in force. Statutes, wherever possible, should be construed in connection and in harmony with the existing common law. See *Balboa Ins. Co. v. Hunter*, 165 Ga. App. 273, 275 (299 SE2d 91) (1983). Accordingly, we do not construe OCGA § 10-5-14 (2007) as abrogating the common law principle that a contract cannot be rescinded in an action brought solely against corporate officers who were not parties to the underlying contract.

(b) Because Greenwald was not authorized to rescind the Subscription Agreement against the defendants,[6] the dispositive question is whether the Merger Clause barred reliance on the alleged oral misrepresentations, or whether Greenwald was entitled to rely on them based on the Reliance Clause. We conclude that under the express language of the Reliance Clause, Greenwald was authorized to rely upon the oral statements made to him at the August 20, 2007 meetings.

Under the applicable rules of contract construction, "[w]e should avoid any construction that renders portions of the contract language meaningless," and "[w]hen a provision specifically addresses the issue in question, it prevails over any conflicting general language." (Citations and punctuation omitted.) *Tower Projects v. Marquis Tower*, 267 Ga. App. 164, 166 (1) (598 SE2d 883) (2004). In the instant case, the Merger Clause is the more general provision, with the Reliance Clause more specifically addressing the situation where, as here, a subscriber had a question and answer session with Verso's representatives "regarding the activities of [Verso] as described in the Offering Documents." Consequently, the trial court erred in holding that the Reliance Clause did not authorize Greenwald to rely on the representations made to him at the August 20, 2007 meetings.

5. For the reasons discussed above, the trial court erred in concluding as a matter of law that Greenwald could not have justifiably relied upon the alleged oral misrepresentations about the 2008 revenue forecast and about the future sale of the NetPerformer division made to him at the August 20, 2007 meetings. The defendants argue, however, that the trial court should be affirmed under the "right for any reason" rule[7] because Greenwald failed to come

---

[6] In light of our decision in Division 4 (a), we need not address whether Greenwald followed the proper procedure for rescinding a contract. See, e.g., *Novare Group*, 290 Ga. at 188 (1).

[7] See *Gilbert v. City of Jackson*, 287 Ga. App. 326, 327 (1) (651 SE2d 461) (2007) ("A grant of summary judgment must be affirmed if right for any reason[.]") (citation and punctuation omitted).

forward with sufficient evidence to establish loss causation with regard to these two misrepresentations.

To establish common law fraud or negligent misrepresentation, a plaintiff must prove that the alleged misrepresentation or omission proximately caused his or her injury. See *Holmes v. Grubman*, 286 Ga. 636, 641 (2) (691 SE2d 196) (2010). Likewise, to establish securities fraud under OCGA § 10-5-12 (a) (2007), a plaintiff must establish that his or her injury was proximately caused by the alleged misstatement or omission. See *Keogler v. Krasnoff*, 268 Ga. App. 250, 254 (1) (601 SE2d 788) (2004). "Proximate cause is properly reserved for the jury and can only be appropriately addressed on summary judgment in plain and indisputable cases." (Citation and punctuation omitted.) *Schernekau v. McNabb*, 220 Ga. App. 772, 773 (470 SE2d 296) (1996).

In the context of securities fraud, "be it statutory or based in the common law," proximate cause requires a showing of "loss causation." (Citation and punctuation omitted.) *Holmes*, 286 Ga. at 642 (2). See *Dura Pharmaceuticals v. Broudo*, 544 U. S. 336, 344 (125 SC 1627, 161 LE2d 577) (2005). "[L]oss causation describes the link between the defendant's misconduct and the plaintiff's economic loss." (Citation and punctuation omitted.) *Robbins v. Koger Properties*, 116 F3d 1441, 1447 (VI) (11th Cir. 1997).[8] This causal link is necessary because the securities laws are not intended to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals*, 544 U. S. at 345 (II) (A).

Significantly, the way in which a plaintiff establishes "loss causation" can differ depending on the specific circumstances of the case at hand. In the context of misrepresentations or omissions concerning publicly traded securities, the plaintiff must prove "that the truth concealed by the defendant entered the marketplace, thereby precipitating a drop in the price of the security." *Holmes*, 286 Ga. at 642 (2). And our Supreme Court has emphasized that the plaintiff in this circumstance must show that the revelation of the truth in the marketplace caused the price to drop, rather than the "tangle" of other factors that can affect price. Id. at 642-643 (2).

But the present case differs from the usual securities action

---

[8] We note that the loss causation requirement and proof of damages are distinct from one another. See *Robbins*, 116 F3d at 1447 (VI), n. 5. OCGA § 10-5-14 (a) (2007) establishes the damages framework for securities fraud claims under the former Georgia Securities Act of 1974. As the first sentence of OCGA § 10-5-14 (a) (2007) reflects, however, proof of a violation of OCGA § 10-5-12 (a) (2007) is a precondition to the application of that damages framework. And, as noted above, a plaintiff must prove proximate cause to establish a violation of OCGA § 10-5-12 (a) (2007), and proximate cause in this context means loss causation.

involving the sale of publicly traded securities, and so "the factual predicates of loss causation fall into less of a rigid pattern." *McCabe v. Ernst & Young, LLP*, 494 F3d 418, 426 (III) (A) (1) (3d Cir. 2007). See also *Livid Holdings Ltd. v. Salomon Smith Barney*, 416 F3d 940, 949 (II) (C), n. 2 (9th Cir. 2005). Specifically, Greenwald alleges that the fraudulent oral misrepresentations were made to him in personal communications with Verso executives in connection with a private sale of restricted securities, and that the securities never became unrestricted or tradeable on the public market before Verso went bankrupt. Hence, "unlike in a typical securities action where a plaintiff could recoup his purchase price by reselling shares before the misstatement or omission became publicly known, [Greenwald was], in effect, locked into the transaction from the time the [Purchase Transaction] closed until the shares were registered." *McCabe v. Ernst & Young, LLP*, Civ. No. 01-5747, 2006 U. S. Dist. LEXIS 524, at *25-26 (I) (B) (D. N.J. Jan. 6, 2006), aff'd, 494 F3d 418 (3d Cir. 2007). Under these circumstances, where there was no marketplace for Greenwald's stock, he should not be required to establish that the truth concealed by the defendants entered the marketplace and caused the stock price to drop.

Nevertheless, Greenwald still must establish loss causation; he must show that "the content of the alleged misstatements . . . caused the financial harm actually suffered by [him]." (Citation and punctuation omitted.) *Livid Holdings Ltd.*, 416 F3d at 949 (II) (C). Here, Greenwald's allegation essentially is that the defendants made fraudulent misrepresentations to him about the future business prospects of Verso that induced him to purchase the restricted stock and stock warrants. In this context, loss causation would be established by Greenwald demonstrating that the failure of those specific business prospects to materialize was a substantial factor in causing his subsequent economic loss. See *McCabe*, 494 F3d at 435 (III) (B) (2). See also *EP Medsystems v. Echocath, Inc.*, 235 F3d 865, 868-869 (I), 884-885 (II) (E) (3d Cir. 2000).

The trial court did not evaluate the evidence in light of this loss causation test to determine if genuine issues of material fact existed. Rather, the trial court chose not to rule on the issue of loss causation in light of its other substantive summary judgment rulings, and the court declined to rule on the defendants' separate motion to exclude the testimony of Greenwald's expert who opined on the issue of causation, concluding that the motion was moot. Under these circumstances, we vacate in part the trial court's summary judgment order and remand the case to the trial court to determine in the first instance whether Greenwald's expert causation testimony was admissible and, if so, whether it established a genuine issue of material fact on the issue of loss causation. See, e.g., *Strength v. Lovett*, 311

Ga. App. 35, 44-45 (2) (b) (714 SE2d 723) (2011) (declining to address causation issue on appeal in part because it involved questions about the scope of expert testimony not fully resolved in the court below); *McGonigal v. McGonigal*, 294 Ga. App. 427, 430 (3) (669 SE2d 446) (2008) (not reaching merits of motion on appeal where trial court declined to rule on the motion on the ground that it was moot).

6. In sum, for the combined reasons set forth above, we vacate the trial court's grant of summary judgment to the defendants on Greenwald's statutory securities fraud and common law tort claims pertaining to the alleged oral misrepresentations about the 2008 revenue forecast and about the future sale of the NetPerformer division. We likewise vacate the trial court's grant of summary judgment to the defendants on Greenwald's claims for punitive damages and attorney fees tied to those two specific oral misrepresentations.[9] Furthermore, with respect to those two oral misrepresentations, we remand for the trial court to determine whether Greenwald's expert causation testimony was admissible and, if so, whether it established a genuine issue of material fact on the issue of loss causation. Lastly, we affirm the trial court's grant of summary judgment to the defendants on Greenwald's remaining statutory and common law claims predicated on all other alleged misrepresentations and omissions.

*Judgment affirmed in part and vacated in part, and case remanded with direction. Adams and Blackwell, JJ., concur.*

DECIDED FEBRUARY 9, 2012 — 

*Sims, Moss, Kline & Davis, Jerry L. Sims*, for appellant.
*Womble, Carlyle, Sandridge & Rice, John G. Despriet, James Connelly, Mark A. Rogers*, for appellees.

---

[9] As noted, the trial court granted summary judgment on all of Greenwald's claims predicated solely upon its conclusion that none of the substantive fraud claims could succeed on the merits. Thus, to the extent the trial court's order granted summary judgment on Greenwald's claims for punitive damages and attorney fees, that ruling was likewise predicated solely on the court's determination that all of the substantive fraud claims failed as a matter of law. See, e.g., *J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*, 284 Ga. App. 552, 561 (g) (644 SE2d 440) (2007) (noting that claims for attorney fees, costs, and punitive damages are not recoverable where plaintiff cannot succeed on his or her substantive legal claims). It follows that because the trial court erred in granting summary judgment on Greenwald's fraud claims pertaining to the 2008 revenue forecast and future sale of the NetPerformer division, the court likewise erred in granting summary judgment on the claims for punitive damages and attorney fees tied to those specific substantive claims. See *Styles v. Mobil Oil Corp.*, 218 Ga. App. 48, 50 (3) (459 SE2d 578) (1995).