**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 14, 2014**

# In the Court of Appeals of Georgia

A13A1679. CHAMPION WINDOWS OF CHATTANOOGA, LLC
    v. EDWARDS.

BRANCH, Judge.

JoAnne Edwards contracted with Champion Windows of Chattanooga, LLC ("Champion" or "Champion-Chattanooga"), for the construction of a deck and screened porch at her residence in Ringgold. After Champion had partially constructed the deck and the porch, Edwards refused to allow Champion to complete the project. Champion then filed the current breach of contract action against Edwards in Catoosa County Superior Court. Edwards filed an answer and counterclaims, in which she sought rescission of the contract and damages for negligent construction.[1] Following

---

[1] Edwards also asserted claims for alleged violations of Georgia's Fair Business Practices Act (OCGA § 10-1-390, et seq.) and a violation of the "peddler" ordinances of Catoosa County. The trial court did not award judgment to Edwards on these claims.

a bench trial, the court entered judgment in favor of Edwards, finding that she was entitled to rescind the contract based on Champion's fraud and that she was entitled to damages resulting from Champion's defective workmanship on the portion of the project that it had constructed. Champion now appeals from that order, asserting that the trial court's judgment is unsupported by the evidence. We agree. Accordingly, we reverse the order of the trial court and remand the case for entry of judgment in favor of Champion on its breach of contract claim and for a determination of damages.

On an appeal from an entry of judgment following a bench trial, we apply a de novo standard of review to any questions of law decided by the trial court, but will defer to any factual findings made by that court if there is any evidence to sustain them. *Lifestyle Home Rentals v. Rahman*, 290 Ga. App. 585 (660 SE2d 409) (2008). "However, if the trial court makes a finding of fact which is unsupported by the record, [that finding] cannot be upheld" and any judgment based upon such a finding must be reversed. (Citation and punctuation omitted.) *Wilen v. Murray*, 292 Ga. App. 30, 31 (663 SE2d 403) (2008).

The record shows that Champion-Chattanooga was incorporated in 1998 and that it is a local subsidiary or division of a national corporation based in Cincinnati, Ohio, that does business under the trade name Champion Window. This parent

2

corporation, in turn, owns three Ohio-based factories, which manufacture the components used in the screened porches, decks, and patio rooms sold and built by Champion Window and its subsidiaries. Champion Window owns 75% of Champion-Chattanooga and the Chattanooga division obtains all of the products it sells from Champion Window or its wholly-owned subsidiaries. Additionally, all of Champion-Chattanooga's employees, including its sales representatives and its managers who construct the patio rooms, decks, and screened porches, travel to Ohio for training at the Champion Window corporate campus. It is the understanding of these employees that although their immediate supervisors are located in Chattanooga, they work for Champion Window (the parent corporation).

In April 2006, after seeing Champion Window's advertisement in a magazine, Edwards called the telephone number listed in the ad to inquire about the construction of a screened porch at her residence. According to Edwards's testimony, she understood that she was calling a business in Chattanooga, Tennessee, and she believed she was calling the local office of a national corporation (Champion Window), that had been in business since 1953. During the phone call, Edwards made an appointment to meet with a Champion representative at her home the following day.

On April 25, 2006, Donald McKenna, a factory sales representative for Champion Window who worked out of the Chattanooga division, visited Edwards in her home and provided her with information regarding Champion Window's products and services. McKenna told Edwards what he referred to as "the Champion story," and provided her with a brochure about Champion Window and its products.[2] McKenna also discussed with Edwards the type of deck, porch, or patio room she was interested in and showed her samples of the building materials manufactured by Champion Window. After Edwards decided that she wanted a deck and screened porch, McKenna priced the project for her. The parties then negotiated over the price, and after McKenna offered her a 15 percent discount, Edwards agreed to contract with Champion for the project. The agreed upon contract price was $29,991, with Edwards providing a down payment of $9,000[3] with the balance to be due when construction was complete.

---

[2] The brochure appears to have been produced by the parent corporation for use by all of its subsidiaries. It bears the corporate logo of Champion Window, advertises the company as having been in business since 1953, and lists the website of Champion Window (www.championwindow.com).

[3] Edwards paid this deposit via check, made payable to "Champion Window."

4

McKenna wrote out the contract using a preprinted form bearing the corporate logo of Champion Window and a Chattanooga address. McKenna filled in blanks and checked boxes on the form specifying the dimensions of the deck and porch, the material to be used, and, where relevant, the color of those materials. He also drew a "layout sketch" of the project in a designated space on the form, which included the dimensions of the proposed construction and its position relative to Edwards's house. Printed on the form, in a separate box immediately next to the contract price is a notice captioned, "BUYER'S RIGHT TO CANCEL." The notice states:

> BUYER MAY CANCEL THIS CONTRACT BY DELIVERING WRITTEN NOTICE TO THE SELLER AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. BUYER MAY USE THIS CONTRACT AS THAT NOTICE BY WRITING "I HEREBY CANCEL" AT THE BOTTOM AND ADDING BUYER'S NAME AND ADDRESS. THE NOTICE MUST BE DELIVERED TO THE SELLER AT THE ADDRESS SHOWN ABOVE.

Additionally, immediately above the contract's signature lines is a paragraph which contains the following sentence: "Since this contract calls for made to order goods, it is not subject to cancellation except as stated above."

Edwards signed the contract and she testified that, before she did so, she read the entire document. She also explained that before she signed, she confirmed with McKenna that Champion had been in business since 1953, "because I wanted to go with a large company, because I thought they would be more reputable." McKenna also signed the contract, on the line designated "Champion Representative."

Construction on the deck and porch began sometime in June 2006. On approximately June 27, 2006, when the project was about fifty percent complete, Edwards's ex-husband, Greg Edwards, called John McGill, a Division Manager for Champion Window who oversees the Chattanooga subsidiary, and informed McGill that he had problems with the price of the project and he wanted the work stopped. McGill and McKenna met with Greg and JoAanne Edwards at Edwards's residence on June 28, 2006 in an attempt to resolve any problems with the project, and according to McGill, Greg Edwards told them that the project "was too much money . . . and that he was putting a stop work order on it."

Greg Edwards testified that he contacted McGill because he had concerns with both the cost of the project and the quality of the construction. He requested that Champion provide him with an itemized cost list and, when it provided that list at the June 28 meeting, it showed what he believed to be an exorbitant cost for a screen

6

door, and he became even more concerned about the cost. He further explained, "I knew that it [the project] was a $10,000-to-$14,000 job, and [Champion's] charging a woman $29,000 for it." Mr. Edwards also testified that his concerns over construction problems grew when McGill was shown those concerns and responded by indicating that Champion would fix any problems on the "punch list" at the end of construction. In Mr. Edwards's opinion, the concerns he was raising were far more serious than those that could be addressed as part of a punch list.

Following the meeting with McGill and McKenna , Greg and JoAnne Edwards sent a letter to McGill in which they stated: "This letter is to confirm our conversations of June 27 and 28. All work on [the] screen porch is ordered stopped immediately. Under no circumstances will Champion Window[ ] be paid for any work done after June 27." On June 29, 2006, Champion's attorney sent a letter to Edwards demanding that the company be allowed to complete the contract. In response, Edwards returned the letter on which she and/or her ex-husband had written, "It is not my intent to allow Champion back on this property . . . contact Robbie Stultz [Edwards's attorney] with all further communications."[4] Champion then sent another letter asking to be allowed to complete the contract, but it never received a response.

---

[4] This note was signed by both Greg and JoAnne Edwards.

After Edwards's continued refusal to honor the contract, Champion filed the current action on July 7, 2006. Trial was held on November 14, 2007.[5] Five years and three months later, on February 11, 2013, the trial court entered an order, drafted by Edwards's lawyer and finding that Edwards was entitled both to rescind the contract and to recover damages for Champion's negligence in performing work pursuant to that contract.[6] This appeal followed.

1. The trial court found that Edwards was entitled to rescind the contract based on Champion's "knowingly . . . false representations as to its work product, its history as a corporation, and its affiliation with Champion [Window]." On appeal, Champion contends that the trial court's findings are unsupported by the evidence and, accordingly, the court's conclusion that Edwards was entitled to rescission constitutes legal error. We agree.

---

[5] Although both the transcript and the trial court's order refer to the November 14 proceeding as a "hearing," it is clear that what transpired was a bench trial.

[6] Notably, although the court found that Edwards was entitled to rescission, its order did not require Champion to return the $9,000 down payment it had received from Edwards or otherwise award judgment to Edwards in that amount. Nor did the order require Edwards to return to Champion its materials which the company had left on Edwards's property for the purpose of completing the screened porch and deck and which Edwards had retained, even after purporting to rescind the contract. Rather, the only relief afforded by the order was a judgment of $1,500 in favor of Edwards and against Champion, as damages for Edwards's negligent construction claim.

To justify rescission of a contract for fraud in the inducement, the party seeking rescission must prove that the party with whom it contracted made a knowingly false representation; that it did so with the intent of inducing the first party to act in reliance on the deliberate misrepresentation; and that the first party justifiably relied on the misrepresentation, to that party's detriment. See *Turner Outdoor Advertising v. Fidelity Eastern Financial*, 185 Ga. App. 815, 816 (366 SE2d 201) (1988). "When evidence as to any one of these elements is lacking," then the rescission claim must fail. (Footnote omitted.) *Young v. Oak Leaf Builders*, 277 Ga. App. 274, 278 (3) (626 SE2d 240) (2006). Here, we find that Edwards failed to present evidence showing either that Champion made any deliberate and knowing misrepresentation to her or that she detrimentally relied on any such misrepresentation.

The trial court's finding that Champion knowingly made a false representation as to "its history as a corporation and its affiliation with Champion [Window]" is apparently based on Edwards's contention that Champion Windows of Chattanooga, LLC, the company with whom she contracted and which did not exist until 1998, misrepresented itself as Champion Window, a company that had been in business since 1953. The evidence, however, shows that Champion-Chattanooga is a subsidiary or division of Champion Window. The parent corporation has 75% ownership of, and

9

therefore controls, Champion-Chattanooga. Additionally, Champion-Chattanooga has no website independent of Champion Window; if a person wants to access information on the internet about the Chattanooga division of Champion Window, they must go through the corporate website of the parent company. All of the employees working out of the Chattanooga division are trained by Champion Window at the parent company's corporate campus, and the employees view themselves as working for the parent corporation. Most importantly, all of the products sold by the Chattanooga division are obtained from Champion Window, and both the labor and the materials on projects sold, installed, or constructed by Champion-Chattanooga are backed by a fifteen-year warranty from Champion Window. Given this evidence, the trial court erred in finding that any statements or representations to Ms. Edwards that she was contracting for the goods and services of Champion Window could be construed as false.

Nor does the evidence support the trial court's finding that Champion knowingly made a false representation "as to its work product." As best we can tell from the record, this finding resulted from Ms. Edwards's assertion that, despite advertising its products as being manufactured by Champion Window, the screen doors on her porch were manufactured by a third-party, Falcon Door and Window

10

Company.[7] The actual sales materials allegedly relied on by Edwards in this regard make the following statements: "Each [patio] room is built to match the design of your home"; patio rooms and porch enclosures are "[d]esigned, manufactured, constructed, and guaranteed by Champion"; "Champion patio rooms are manufactured in our own factory"; and "Champion designs, manufactures, installs and guarantees your patio room."

The evidence presented at trial showed that the walls, roof, windows, and screens used in the screened porch being constructed for Edwards were all manufactured at one of three facilities owned by Champion Window, and the doors were manufactured to Champion Window's specifications. In light of this evidence, we fail to see how the statements in the advertising material can be viewed as false. The advertisement stated that Champion manufactured the actual parts of the room itself; it says nothing about the doors. More importantly, assuming that the door could be considered a component of the room, Edwards failed to show how any misrepresentation regarding the door's manufacturer was material – i.e., that she would have received different or better doors if they had actually been manufactured

---

[7] When questioned about this fact at trial, McKenna explained that Falcon manufactured the doors under contract with Champion Window, to Champion Window's specifications.

by Champion, as opposed to being manufactured for Champion.[8] See *Greenwald v. Odom*, 314 Ga. App. 46, 55 (2) (723 SE2d 305) (2012) ("[a] fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice or action in the transaction in question") (citations and punctuation omitted).

Finally, regardless of Edwards's proof regarding any arguably false statements made by Champion, her rescission claim would still fail. This is so because she did not present any evidence showing that she relied on these alleged misrepresentations to her detriment. See *Turner Outdoor Advertising*, 185 Ga. App. at 816-817 (reversing judgment in favor of defendant, which had prevailed on its counterclaim for rescission, where defendant had failed to show it relied on the alleged misrepresentations of the opposing party or that it had suffered damages as a result of any such reliance). Here, we have carefully scrutinized all of Edwards's testimony, and she never stated that she would not have entered the contract had she known either that she was contracting with a local division of Champion Window, rather than the

---

[8] In this regard, we note that Edwards's only complaint regarding the door had nothing to do with its quality. Rather, once Edwards asked for and received an itemized price list of the components of the project, she thought she was being charged too much for the doors and too much for the overall project.

parent company itself, or that the screen doors to be installed on the project were manufactured for Champion, rather than by Champion. Accordingly, she failed to show that she relied on any misrepresentations of Champion when she executed the contract. See *Young*, 277 Ga. App. at 279 (3) (affirming a grant of summary judgment against parties seeking rescission of a contract and noting that the allegedly defrauded parties had presented no evidence showing how the alleged misrepresentation had influenced their decision to proceed with the contract); *Greenwald*, 314 Ga. App. at 55-56 (2).

Moreover, assuming that Edwards's testimony could be construed as showing reliance, she failed to show how she was damaged by this reliance. See *Robertson v. Panlos*, 208 Ga. 116, 119 (65 SE2d 400) (1951) ("[a]n essential element of an action for rescission of a contract by reason of fraud is injury to the complaining party"). Specifically, the evidence showed that Edwards received products that were manufactured by Champion Window and that were constructed or installed by an employee who had been trained by Champion Window, at the parent company's corporate facilities. Edwards also received a fifteen-year warranty from Champion Window (the parent company) on all the labor and materials that went into her deck and screened porch. Accordingly, Edwards failed to show how any product or benefit

13

she received would have been different had she contracted directly with Champion Window, as opposed to Champion-Chattanooga. For this additional reason, therefore, the trial court erred in finding that Edwards was entitled to rescind the contract. See *Tyson v. McPhail Properties*, 223 Ga. App. 683, 687 (5) (478 SE2d 467) (1996) (holding that a party could not prevail on its affirmative defense of rescission where it offered no evidence as to how it was damaged by the alleged misrepresentations of the other party).

2. The trial court found in favor of Edwards on her claim for negligent construction and awarded her $1,500 in damages on this claim, based on the testimony of Edwards's expert witness that it would cost that amount to have the negligently constructed project torn down and removed from Edwards's property. Because the trial court's findings with respect to the negligent construction claim are unsupported by either the evidence or the law, we also reverse this part of the trial court's order.

We first note that as a matter of law, Edwards could not recover on both her claim for rescission and her claim for negligent construction, because her claim for negligent construction was based upon a contractual duty. See *Fields Bros. Gen. Contractors v. Ruecksties*, 288 Ga. App. 674, 676-677 (1) (655 SE2d 282) (2007) ("there is implied in every contract for work or services a duty to perform it skillfully,

14

carefully, diligently, and in a workmanlike manner") (footnote omitted). And rescission represents "a remedy in which neither party is held liable in damages for breach of the contract," because the contract is considered void. (Citations omitted.) *Martin v. Rollins, Inc.*, 238 Ga. 119, 120 (1) (231 SE2d 751) (1977). Accordingly, if the contract was void, Edwards could not recover damages for its breach. Given that we have found that Edwards failed to prove her claim for rescission, however, we address the merits of her negligent construction claim.

In support of this claim, Edwards introduced the testimony of Vincent Morris, who was qualified as an expert on the subject of deck construction. Morris testified that he inspected the deck approximately two months after Champion had ceased work on the project and found what he believed were six or seven "major violations" of the "Georgia Building Code." These alleged violations included a lack of footings in the post holes; problems with the deck framing; problems with the length of the spans; the installation of a single band of wood, as opposed to a double band, on the deck perimeter; the lack of flashing between the deck and the house; and defects in the construction of the stairs. On cross examination, however, Morris admitted that most, if not all, of the problems he found could be corrected. He also acknowledged that the project did not look finished to him, as there was still "quite a bit" to be done. Morris

15

further stated that in his experience as a contractor, he would expect a customer to tell him if they saw problems with or were dissatisfied with a project, so that he could correct any deficiencies. And he admitted that if a building inspector pointed out code violations, a contractor would have no choice but to fix the project at its own expense, so that it complied with the applicable building code.

When questioned about the alleged problems with the construction, Rick Tragesser, the Champion Patio Room Manager who performed that construction, stated that there were a number of corrections that would need to be made before the project was considered completed. Champion was never given the opportunity to complete the project, however, and therefore it could not remedy the admitted deficiencies. Tragesser also testified that the project would not be considered complete until approved by the building inspector, and if the building inspector found any code violations, Champion would correct them. Similarly, McKenna testified that if Champion was made aware of problems with its construction or if the customer was dissatisfied with Champion's work, the company would remedy the problems. McGill echoed this sentiment, noting that Champion provided a 15-year warranty on both materials and labor.

Based on this evidence, the trial court found that Champion was negligent in constructing the project because "it violated applicable building codes" and its work

was "not performed in a workmanlike manner." This finding, however, ignores the fact that Edwards failed to prove her claim that Champion's work violated applicable building codes – i.e., that the company was negligent per se. Although Edwards's expert testified that Champion's work violated the "Georgia Building Code" in several ways, Edwards did not introduce any state, county, city or other building code into evidence. Moreover, the expert did not identify any specific code sections (either by name or number) as having been violated. Rather, he simply testified as to the various defects in the project that he claimed did not meet "code requirements". Given Edwards's failure to introduce either a copy of the applicable building code or identify with specificity the sections of that code that Champion's construction violated, she also failed to prove her claim of negligence per se. See *Norman v. Jones Lang Lasalle Americas*, 277 Ga. App. 621, 629 (2) (b) (627 SE2d 382) (2006) (affirming grant of summary judgment in favor of defendant on plaintiff's claims of negligence per se, where plaintiff failed to offer in to evidence a copy of the applicable building code or specify which sections of the code the defendant had violated); *Spooner v. City of Camilla*, 256 Ga. App. 179, 184 (2) (b) (568 SE2d 109) (2002) (plaintiffs could not prove their claim of negligence per se where they failed to identify any specific statute, rule, or regulation allegedly violated by the defendants; the testimony of

plaintiffs' expert that he knew such rule existed because he had read "various rules and regulations" was hearsay and therefore lacked probative value).

Additionally, as a matter of law "[a] party to a contract can not cause a breach or delay in compliance by the other, and then set up the breach or delay so caused as freeing him from the contract." *Ray M. Wright v. Stinchcomb*, 259 Ga. App. 212, 214 (576 S.E.2d 566) (2002) (citation and punctuation omitted). See also *Georgia 20 Properties LLC v. Tanner*, 255 Ga. App. 6, 10 (2) (564 SE2d 459) (2002) ("[a] party cannot avoid the obligations of a contract by frustrating the performance of a condition precedent") (footnote omitted). Here, the evidence showed that all of the alleged defects could have been remedied, a fact that even Edwards's expert conceded. Edwards, however, refused to allow Champion to complete the contract and therefore deprived it of the opportunity to cure any alleged defects in its work. In other words, Edwards's contractual breach resulted in Champion's alleged breach of its contractual obligation to provide a product free of defective workmanship. Having caused this alleged breach, Edwards could not thereafter seek to recover for it. See *Allied Enterprises v. Brooks*, 93 Ga. App. 832, 834 (3) (93 SE2d 392) (1956) ("[w]here a defendant prevents the performance of a stipulation of a contract undertaken by the plaintiff, he is estopped from setting up in his own behalf any injury which may have

18

resulted from the nonperformance of such condition") (citation and punctuation omitted).

For the reasons set forth above, we reverse the order of the trial court granting judgment in favor of Edwards on her claims for rescission and negligent construction. Additionally, given that Edwards's only defense to Champion's breach of contract claim was rescission, and given that she was not entitled to rescind the contract, we further find that the trial court erred in failing to find in favor of Champion on its breach of contract claim.[9] Accordingly, we remand the case for entry of judgment in favor of Champion and for a trial on the issue of damages.[10]

_____

[9] We do not address Edwards's claim that Champion Window (the parent company) should have been named as a party to this action, either in lieu of or in addition to Champion-Chattanooga. "Issues and objections not raised in the trial court and ruled on by the trial court are deemed waived and cannot be raised for the first time on appeal." (Footnote omitted.) *West v. State*, 300 Ga. App. 583, 585 (2) (685 SE2d 486) (2009). Thus, because Edwards did not raise this issue in the court below, she has waived this potential defense. *HWA Properties v. Community & Southern Bank*, 322 Ga. App. 877, 881 (1) (a) (746 SE2d 609) (2013) (in a suit to recover on a note and guaranty, defendants' failure to raise any defense related to plaintiff's status as a holder or nonholder in possession of the note and guaranty under the Commercial Code resulted in a waiver of that defense).

[10] In this regard, we note that Champion is seeking to recover the balance of the contract price. However, the contract does not contain a liquidated damages provision, and the general measure of damages in a case such as this

> is the net profit to which the contractor would have been entitled had full
> performance of the contract been permitted. That figure is reached by

19

*Judgment reversed and case remanded with direction. Phipps, C. J., and Ellington, P. J., concur.*

---

subtracting from the contract price the amount which full performance would have cost the contractor. If performance by either party had begun prior to the breach, adjustments must be made to ensure that the contractor receives the full amount of the profit, but no more. First, there must be added to the profit figure the amount of the contractor's net loss up to the point of the breach. That figure is reached by subtracting from the expenses incurred by reason of the contractor's performance the salvage or resale value of the material left on hand. The sum of those figures (the profit which would have been realized from full performance plus net loss incurred by performance to the date of breach) may in no event exceed the contract price. Second, there must be deducted from the recovery those amounts received by the contractor from the owner as prepayment or progress payment.

*Williams v. Kerns*, 153 Ga. App. 259, 266-267 (1) (265 SE2d 605) (1979). See also *Dill v. Chastain*, 234 Ga. App. 770, 771 (507 SE2d 872) (1998).