# WHOLE COURT

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 16, 2014**

# In the Court of Appeals of Georgia

A14A0718. LEGACY ACADEMY et al. v. MAMILOVE, LLC et al.   JE-038

ELLINGTON, Presiding Judge.

In this case involving a dispute arising from a day care center franchise agreement, a Gwinnett County jury rendered a verdict in favor of the plaintiffs, franchisee Mamilove, LLC and its officers, Michele Reymond and Lorraine Reymond (collectively, "Mamilove"), and against the franchisors, Legacy Academy, Inc. and its officers, Frank and Melissa Turner (collectively, "Legacy"). The superior court denied a motion for new trial filed by Legacy, and Legacy appeals from the court's judgment on the verdict and from its order on the motion for new trial. Legacy contends that the trial court erred in rejecting its argument that Mamilove's claims were barred as a matter of law, in denying its motion for a directed verdict on all of

the claims, in excluding certain evidence, and in denying its motion for new trial. Finding no error, we affirm.

Viewed in favor of the jury's verdict,[1] the evidence presented showed the following facts. In 2001, sisters Michele and Lorraine Reymond entered into discussions with Frank and Melissa Turner about opening a Legacy Academy daycare franchise. In July 2001, the Turners gave the Reymonds a pro forma earnings claim in the form of an income and expense statement (hereinafter, the "earnings claim") that was purportedly based upon the actual income and expenses of Legacy franchises that were then in operation. According to the earnings claim, a new franchisee would have approximately $260,000 in net income after the first year of operation and approximately $440,000 in net income after each of the second and third years. Relying upon the earnings claim, the Reymonds decided to open a Legacy franchise. The Turners showed the Reymonds property on Old Peachtree Road in Gwinnett County and the Reymonds agreed to build their daycare center there.

---

[1] See *ALEA London Ltd. v. Woodcock*, 286 Ga. App. 572, 576 (2) (649 SE2d 740) (2007) ("On appeal, we examine the record in the light most favorable to the verdict and judgment. A jury verdict, after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law.") (punctuation and footnotes omitted).

On September 13, 2001, the Reymonds met with the Turners, who gave them a 17-page "Franchise Offering Circular for Prospective Franchisees for Non-Registration States" (the "franchise circular") and a 37-page, 25-year Franchise Agreement (the "franchise agreement"). The Reymonds did not have time to read the documents or consult with an attorney before signing them, however, because the Turners "pressured" them, telling them with "a sense of urgency" that they had to sign the documents that day or other franchisees would "take" the Old Peachtree Road location and it could be months before another location became available. As a result, the Reymonds signed the circular, the agreement, and an amendment to the agreement. The Reymonds also paid Legacy a $30,000 franchise fee.

The Turners subsequently informed the Reymonds that they could not build their center at the Old Peachtree Road location after all, purportedly because of "issues with the zoning" of that property. Several months later, in February 2002, the Reymonds executed an agreement to purchase 2.6 acres of land in Sugar Hill from the Turners[2] and a contract with a construction company owned by Frank Turner,

---

[2] The record shows that the Turners purchased 6.6 acres of property at the Sugar Hill location for $440,000, and then, on the same day, sold the Reymonds a 2.26-acre parcel of the property for $525,000, thereby obtaining an immediate and substantial profit on the land. The Turners constructed a building for the Legacy Academy corporate headquarters on the remaining four acre parcel right behind

3

Commercial Contractors Enterprises ("CCE"), to build a daycare center on that property. At the October 2002 closing, the Reymonds gave CCE a $40,000 check to be applied to the building's construction costs, executed two bank notes totaling $1,884,450 to pay for the property and the construction of the building, and signed a $200,000 promissory note in favor of CCE. Frank Turner told them that execution of the note was required to reimburse CCE for "equity" it allegedly contributed to assist with the closing of the bank loans and that they had to sign the note "or the whole deal would fall through." Ultimately, the Reymonds invested more than $2.2 million in the franchise and daycare center.

The Reymonds opened their daycare center in November 2002 and, by the end of its first year of operation, they had lost $212,300. Although they recorded net earnings of $103,692 in 2004 and $66,507 in 2005, those amounts were still far less than the $440,000 in annual profits that the other franchisees had earned, according to the earnings claim the Reymonds had received from the Turners.[3] The Reymonds repeatedly attempted to discuss with the Turners their concerns regarding the

Mamilove's daycare center.

[3] Net earnings for subsequent years also fell far short of those represented in the earnings claim, with the Reymonds earning just $89,947 in 2006, $40,668 in 2007, $17,213 in 2008, and $28,299 in 2009.

business' inability to enroll more children and its poor financial performance, but the Turners "berated and badgered" them in response, telling them that they were doing something wrong and that the lack of income was their fault for accepting part-time enrollees, charging tuition that was too low, not marketing the center enough, etc.[4] In addition, the Turners contributed to the center's poor performance by opening two more daycare center franchises within five miles of Mamilove's center between 2006 and 2008. When the Reymonds tried to consult with other franchisees to compare their financial performance, the others refused to participate due to Legacy's policy of discouraging the franchisees from discussing the financial performance of their daycare centers with each other.

In 2008, five of Legacy's franchisees jointly left the franchise and sued Legacy and the Turners.[5] While talking to some of these franchisees about their complaints

---

[4] According to Michele Reymond, she tried to avoid complaining too often or committing any violations of Legacy's policies because she was concerned about getting "default letters" from Legacy for even minor or inadvertent infractions, which she feared would cause Legacy to take over Mamilove's center.

[5] The franchisees asserted claims for fraud, negligent misrepresentation, RICO violations, and breach of contract. In July 2010, an arbitrator issued an award in favor of franchisees that was later confirmed by the Superior Court of Gwinnett County. At trial in the instant case, the parties agreed that they would not present to the jury evidence of the arbitration award. See Division 1, infra.

against Legacy and the Turners, the Reymonds found out information that, combined with Mamilove's poor financial performance, caused them to decide to terminate their Legacy franchise agreement. As a result, in August or September 2010, Mamilove stopped paying Legacy the monthly five percent royalty fees and one percent advertising fees required by the agreement. Then, on September 2, 2010, the Reymonds' attorney sent a letter to the Turners notifying them that the Reymonds intended to terminate the franchise agreement, effective October 1. According to the letter, the Reymonds believed that Legacy had violated certain rules of the Federal Trade Commission (the "FTC Rules") by, inter alia, failing to timely provide them with the franchise circular and agreement and making an earnings claim that was prohibited by the FTC. In addition, the Reymonds asserted that the strength of the Legacy "brand" had been severely reduced due to the fraud committed by the Turners that resulted in the 2008 litigation by the other franchisees and the "bad will" that resulted.[6]

---

[6] After removing Legacy's insignia and other materials from the daycare center, the Reymonds began operating the center as the "Wise Owl Academy."

In November 2010, Mamilove filed suit against Legacy, asserting a claim under OCGA § 51-1-6 that was based upon Legacy's violations of the FTC Rules,[7] a claim that Legacy violated Georgia's RICO Act,[8] and claims for fraud, negligent misrepresentation, and rescission.[9] Legacy answered the complaint and filed a breach of contract counterclaim based upon Mamilove's failure to pay it royalty and marketing fees due under the franchise agreement after August 2010. The parties filed cross-motions for summary judgment on the opposing claims, and the trial court denied the motions.

At trial, Mamilove presented the evidence outlined above, as well as evidence that the earnings claim the Reymonds received from the Turners in the summer of 2001 was, in fact, fraudulent. The evidence showed that the earnings claim was not a historical representation of the actual revenues and expenses of the existing Legacy franchises, as the Turners had claimed, but was, instead, mere speculation based upon assumptions regarding the total revenues and expenses a franchise might experience.

---

[7] See Division 6, infra.

[8] See OCGA § 16-14-1 et seq. (the "Georgia Racketeer Influenced and Corrupt Organizations Act").

[9] Mamilove also asserted claims against the contractor that built its daycare center, but those claims are not at issue in this appeal.

In addition, Mamilove presented the testimony of four former Legacy franchisees. Patricia Williams, who opened the first Legacy daycare center franchise in November 1998, lost over $283,000 in her first year of operation and lost another $147,000 in the second year. She provided her financial statements to Frank Turner in March 2000 – over a year before the Turners gave the Reymonds the earnings claim that was supposedly based on the performance of Williams' center and the other franchises. Another franchisee, Tim Paulus, testified that he was considering opening a Legacy franchise in the summer of 2001, and Frank Turner gave him an earnings claim that was very similar to the one the Turners gave to the Reymonds around the same time. As with the Reymonds, Turner told Paulus that the earnings claim was based on the actual performance of the existing Legacy franchises. The other two franchisees, Ann Weaks and Bobby Vatalaro, testified that, when they contacted Legacy about opening a franchise, the Turners gave them an earnings claim similar to that given to Paulus and the Reymonds and told them that the figures shown were not merely estimations or projections but were based on the actual revenues and expenses of existing Legacy franchises. In reliance on the earnings claim, each franchisee decided to open a daycare center. According to Weaks, she and the Turners had agreed on a location for her daycare center before she signed the franchise

agreement, but the Turners called her one day and told her that she had to sign the agreement immediately and pay the $40,000 franchise fee or she would lose the location to another franchisee. As with the Reymonds, when Weaks arrived at the Legacy office, she was given a franchise agreement to sign immediately, without an opportunity to read it beforehand. Similarly, Vatalaro testified that, before he had chosen a location for his center, Frank Turner unexpectedly called him and offered him a location, telling him that he had to commit to it within 24 hours because there was "a long list of people" who wanted the property. Both Weaks and Vatalaro testified that their franchises lost hundreds of thousands of dollars between 2004 and 2009. And, as with the Reymonds, when Weaks complained about the losses to the Turners, they told her that other daycare franchises were "doing fine" and that it was her fault that her center was not succeeding.[10]

Testifying in their defense, the Turners denied that they or anyone on Legacy's behalf had given the Reymonds an earnings claim for the franchise before the Reymonds signed the franchise agreement on September 13, 2011. The Turners also claimed, inter alia, that they had given the Reymonds the franchise circular prior to

_____

[10] Notably, although the most Legacy daycare center franchises in operation at one time was about twenty-five, only ten were still in operation at the time of the 2013 trial in this case.

9

September 13, and Frank Turner denied that he had ever promised the Reymonds that they could build a center at the Old Peachtree Road location. Finally, they denied that they had pressured or otherwise prevented the Reymonds from reading the franchise agreement before signing it.

Based upon the evidence presented, the jury rendered a general verdict in favor of Mamilove on all of its claims and awarded it $750,000, plus $350,000 in damages based upon the RICO violations, and $30,000 in attorney fees. The jury also found that Frank and Melissa Turner were personally liable for the judgments. In addition, the jury found in favor of Mamilove on Legacy's breach of contract counterclaim. The court entered judgment on the verdict.[11]

1. On appeal, Legacy contends that the trial court erred in denying it summary judgment on Mamilove's claims based upon the expiration of the statute of limitation periods for the claims. It has abandoned this issue, however.

Generally,

[a]fter verdict and judgment, it is too late to review a judgment denying a summary judgment, for that judgment becomes moot when the court reviews the evidence upon the trial of the case. Where a motion for

---

[11] See Division 11, infra, regarding the trial court's denial of Legacy's motion for new trial.

10

summary judgment is overruled on an issue and the case proceeds to trial and the evidence at the trial authorizes the verdict (judgment) on that issue, any error in overruling the motion for summary judgment is harmless.

(Punctuation, footnotes, and emphasis omitted.) *ALEA London Ltd. v. Woodcock*, 286 Ga. App. 572, 575 (1) (649 SE2d 740) (2007). However,

if the legal issues raised and resolved in denying the motion for summary judgment were not considered at trial, then the denial of the motion is not rendered moot by the verdict and judgment. Under such circumstances, a party may appeal the denial of summary judgment as part of the party's direct appeal from the final judgment, and the denial will be reviewed and determined by this Court. See OCGA § 5-6-34 (d)[.]

(Citations and punctuation omitted.) *Coregis Ins. Co. v. Nelson*, 282 Ga. App. 488, 489 (1) (639 SE2d 365) (2006).

On appeal, Legacy argues that the ruling at issue is not moot because the statute of limitation issue was not submitted to the jury at trial. This argument is patently disingenuous, though, as the trial transcript clearly shows that Legacy expressly abandoned its statute of limitation defense at the beginning of trial. Specifically, the transcript shows that, during a discussion of Legacy's objection to

the admission of evidence of the arbitrator's award in suits against Legacy that had been brought by other franchisees, Mamilove's counsel proposed the following compromise: "[If Legacy] were to drop the statute of limitations defense, the arbitration award would not come in. We would still be talking [about] franchisees [and a] similar sort of pattern of activity with respect to the RICO claim, but the [arbitration] award doesn't come in." In response, Legacy's counsel agreed that Legacy would not assert a statute of limitation defense. Therefore, under these circumstances, this alleged error is no longer subject to appellate review. See *ALEA London Ltd. v. Woodcock*, 286 Ga. App. at 575 (1); *Crawford v. Crump*, 223 Ga. App. 119, 122 (2) (476 SE2d 855) (1996) ("A stipulation by the parties upon which a resolution of some issue is to be made is binding even though it might in some manner contradict or conflict with the pleadings. Evidence contrary to the stipulation is not admissible; since it is binding, it may not be disproved.") (citations and punctuation omitted); see also *Renee Unlimited v. City of Atlanta*, 301 Ga. App. 254, 257 (1) (687 SE2d 233) (2009) ("A litigant . . . cannot submit to a ruling, acquiesce in the ruling, and still complain of same.") (citation and punctuation omitted).

2. Legacy also contends that the trial court erred in denying its motion for summary judgment on Mamilove's rescission claim, arguing that Mamilove waived its right to rescind the franchise agreement by failing to seek rescission in a timely manner as a matter of law. However, after the trial court denied the motion for summary judgment, the parties submitted to the jury the questions of whether Mamilove was entitled to equitable rescission of the agreement and whether it timely moved for rescission of the agreement under the circumstances. Consequently, because there was evidence presented at trial to support a finding by the jury that Mamilove timely asserted its rescission claim under the circumstances presented, the question of whether the trial court properly denied Legacy summary judgment on this issue is moot.[12] See *ALEA London Ltd. v. Woodcock*, 286 Ga. App. at 575 (1).

---

[12] Further, to the extent that Legacy contends that it was entitled to a directed verdict on this issue, the record shows that Legacy failed to raise this issue in its motion for a directed verdict. Regardless, Legacy would not have been entitled to a directed verdict on this issue, because there was evidence to support the jury's finding that Mamilove timely asserted its claim for rescission. See *Krayev v. Johnson*, ___ Ga. App. ___ (Case No. A14A0233, decided April 21, 2014) ("[T]he question as to what is a reasonable or proper time within which to rescind a contract depends upon the facts of the particular case and is ordinarily a question for the jury.") (citation and punctuation omitted); *Stubbs v. Harmon*, 226 Ga. App. 631, 632 (1) (487 SE2d 91) (1997) ("When there exists any evidence to support the jury's verdict, and no reversible error is otherwise committed, the verdict will stand. It is the function of the jury to resolve conflict[s] in [the] testimony; this Court will not substitute its

13

3. Legacy contends that Mamilove waived its right to rescind the agreement as a matter of law when it claimed that Legacy had breached the agreement, because, in asserting that claim, Mamilove acted in a manner that was inconsistent with its purported repudiation of the agreement. This contention lacks merit.

"In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." (Punctuation and footnote omitted.) *Dodds v. Dabbs, Hickman, Hill & Cannon*, 324 Ga. App. 337, 340 (1) (750 SE2d 410) (2013).

> Where a party who is entitled to rescind a contract on ground of fraud or false representations, and who has full knowledge of the material circumstances of the case, freely and advisedly does anything which amounts to a recognition of the transaction, or acts in a manner inconsistent with a repudiation of the contract, such conduct amounts to acquiescence, and, though originally impeachable, the contract becomes unimpeachable in equity.

(Punctuation and footnote omitted.) Id. at 341-342 (1).

---

judgment for that of the jury and will neither weigh evidence nor determine witness credibility.") (citations omitted).

14

In this case, the record shows that Mamilove did not affirm the contract and then assert a breach of contract claim against Legacy in its complaint; instead, it sought rescission of the agreement. In contrast, Legacy's breach of contract counterclaim asserted that Mamilove had breached the agreement by failing to pay royalties and other fees due under the contract. Subsequently, in the consolidated pretrial order, Mamilove, as the defendant to that counterclaim, raised the defense that Legacy's fraudulent conduct constituted a prior breach of the agreement that had relieved Mamilove of its obligations under the agreement. Legacy now argues that, by asserting a defense that was based on the agreement, Mamilove affirmed the agreement and, thus, waived its right to rescission of the agreement. However,

> there is a fundamental difference between the assertion of a "defense" by a defendant and the assertion of a right to affirmative relief through the filing of a "claim" . . . by one who thereby occupies the status of a plaintiff. A "defense" is "that which is offered and alleged by the party proceeded against in an action or suit, as a reason in law or fact why the plaintiff should not recover or establish what he seeks. A defense is not something by means of which the party who interposes it can obtain relief for himself."

(Citation and punctuation omitted.) *T. V. Tempo, Inc. v. T. V. Venture, Inc.*, 182 Ga. App. 198, 200 (1) (355 SE2d 76) (1987). Thus, under the circumstances presented,

15

we conclude that Mamilove did not waive its right to rescission by asserting a contract-based defense against Legacy's breach of contract counterclaim.

4. Legacy contends that the trial court erred in failing to grant its motion for a directed verdict on Mamilove's claim for rescission of the franchise agreement.

> [O]n appeal from a trial court's rulings on motions for directed verdict and judgment notwithstanding the verdict, we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments notwithstanding the verdict are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict.

(Citation and punctuation omitted.) *Fertility Technology Resources v. Lifetek Med.*, 282 Ga. App. 148, 149 (637 SE2d 844) (2006). See also *Rolleston v. Estate of Sims*, 253 Ga. App. 182, 185 (4) (558 SE2d 411) (2001) ("The question before this [C]ourt is not whether the verdict and judgment of the trial court were merely authorized [by the evidence presented], but is whether a contrary judgment was demanded.") (citations and punctuation omitted).

On appeal, Legacy argues that Mamilove could not prove that the Turners fraudulently induced them to sign the agreement by showing them the earnings claims because the agreement specifically states that Mamilove had not received any

16

representations of potential income or earning capabilities from Legacy prior to signing the agreement.[13] According to Legacy, because it is undisputed that the Reymonds failed to read the agreement before signing it, they were estopped as a matter of law from asserting a claim for rescission of the agreement based upon allegations of fraudulent inducement.

> It is well-settled law in Georgia that a party who has the capacity and opportunity to read a written contract cannot afterwards set up fraud in the procurement of his signature to the instrument based on oral

---

[13] Specifically, the agreement contained the following relevant provisions:

24.2. *No Representations, Warranties or Guarantees*. Franchisor expressly disclaims the making of, and Franchisee and each Owner acknowledge that it has not received from Franchisor or any party on behalf of Franchisor, any representation, warranty or guarantee, express or implied, as to the potential volume, profit, income or success of the business licensed under this Agreement. . . .

24.7. *No Earnings Claims*. Franchisee acknowledges that neither Franchisor, nor any person on behalf of Franchisor, has made any written, oral or visual representation of (i) earnings capability of Legacy Academy Center; (ii) a specific level or potential sales, income, gross or net profit for the Franchisee; or (iii) a specific level of sales, income, gross or net profits of existing centers (whether franchised or company-owned) other than as specifically described in the Offering Circular.

17

representations that differ from the terms of the contract. . . . In fact, the only type of fraud that can relieve a party of his obligation to read a written contract and be bound by its terms is a fraud that prevents the party from reading the contract.

(Citations and punctuation omitted.) *Novare Group v. Sarif*, 290 Ga. 186, 188-189 (2) (718 SE2d 304) (2011).

Although it is undisputed that the Reymonds did not read the agreement prior to signing it, the parties submitted to the jury the question of whether the Turners intentionally prevented the Reymonds from reading the agreement before they signed it. Mamilove then presented evidence showing, inter alia, that the Turners first gave the Reymonds the 17-page circular and 37-page agreement on September 13, 2001, and told them that they had to sign the documents that day or another franchisee would be allowed to take the daycare center location they had chosen and it could be months before another location became available.[14] Thus, from the evidence presented, the jury was authorized to find that *the Turners intentionally prevented the Reymonds from reading the agreement before signing it in order to conceal from*

---

[14] Accordingly, the dissent's statement that the Reymonds "presented no evidence that the Turners said or did anything that prevented them from reading the agreement before they signed it" is simply incorrect.

18

*them the provisions at issue here, which the Turners knew were false.*[15] See *Stubbs*

*v. Harmon*, 226 Ga. App. 631, 632 (1) (487 SE2d 91) (1997) (The jury's verdict will

---

[15] The dissent misrepresents this conclusion by stating that "the majority concludes that Mamilove is entitled to rescind the franchise agreement despite the Reymonds' failure to read it because the jury was authorized to find that they were 'pressured' or 'rushed' into signing it." To be clear, the evidence did not only show that the Turners merely "pressured" the Reymonds into signing the agreement before reading it; it authorized the jury to find that the Turners actively defrauded the Reymonds by intentionally preventing them from reading the voluminous agreement so that they would be bound by the 25-year agreement before discovering the false statements contained therein.

Further, the facts in the cases cited by the dissent on this issue are clearly distinguishable from those presented in this case. The Reymonds never testified that they could not read the agreement because they were "too busy" or "occupied with other business." Cf. *Citicorp Indus. Credit v. Rountree*, 185 Ga. App. 417, 420 (1) (364 SE2d 65) (1987) (wherein there was no evidence that the opposing party "employed any artifice to prevent [the plaintiffs] from reading the agreements. The fact that [the plaintiffs] deemed themselves too busy to read the lease and indemnification agreements prior to signing them will not authorize them to avoid their obligations to appellant thereunder."); *Bradley v. Swift & Co.*, 93 Ga. App. 842, 857 (3) (93 SE2d 364) (1956) (wherein there was no evidence that the opposing party committed any actual fraud on the guarantor from whom he was trying to collect a debt, and the guarantor admitted that he did not read the guaranty before signing it because he was occupied with his other business at the time). Nor did the Reymonds contend that they signed the agreement by mistake, thinking it was a different type of agreement, or that they had read the agreement, consulted with an attorney, and then waited months before signing it despite their objections to certain provisions of the agreement that they believed were contrary to their best interests. Cf. *Citizens Bank, Vienna v. Bowen*, 169 Ga. App. 896, 897 (1) (315 SE2d 437) (1984), and *Tidwell v. Critz*, 248 Ga. 201, 203-204 (1) (282 SE2d 104) (1981), respectively.

stand if there is any evidence to support it.).[16] And, given such a finding, the Reymonds cannot be deemed to have knowingly agreed to such provisions and to have waived the instant claims as a result.

It follows that, despite the fact that the agreement stated otherwise, the evidence presented authorized the jury to find that Frank Turner did, in fact, show the Reymonds a fraudulent earnings claim prior to September 13, 2001, and that he did so with the intention of inducing them to execute the franchise agreement. See *Greenwald v. Odom*, 314 Ga. App. 46, 53-54 (1) (723 SE2d 305) (2012) (The evidence presented authorized the jury to find that a revenue forecast provided by the seller included an actionable false statement of an existing fact that was intended to induce the buyer to enter into the purchase transaction.). Consequently, Legacy was not entitled to a directed verdict on Mamilove's rescission claim, and the jury's verdict in favor of Mamilove on that claim must be affirmed. See *Fertility Technology*

---

[16] Cf. *Novare Group v. Sarif*, 290 Ga. at 189 (2) (wherein there was no allegation that the sellers tried to prevent the purchasers from reading the terms of the agreements); *Raysoni v. Payless Auto Deals*, 323 Ga. App. 583 (753 SE2d 313) (2013) (wherein there was no allegation that the buyer was prevented from reading the contract or from determining whether the seller's oral statements were true before he purchased a car); *Campbell v. Citizens & Southern Nat. Bank*, 202 Ga. App. 639, 640 (415 SE2d 193) (1992) (wherein the debtor did not claim that he was prevented from reading the note before he signed it).

20

*Resources v. Lifetek Med.*, 282 Ga. App. at 149; *Rolleston v. Estate of Sims*, 253 Ga. App. at 185 (4); *Stubbs v. Harmon*, 226 Ga. App. at 632 (1).

5. Legacy contends that the trial court erred in denying its motion for a directed verdict on Mamilove's claims for fraud, negligent misrepresentation, and RICO violations because the merger or "entire agreement" provision in the franchise agreement bars these claims as a matter of law. Section 24.6 of the agreement states as follows: "*Entire Agreement.* Franchisee acknowledges that this agreement constitutes the entire agreement of the parties with respect to the matters contained herein. This [a]greement terminates and supersedes any prior agreement between the parties concerning the same subject matter." According to Legacy, this provision prevents the Reymonds from proving that they reasonably relied on the earnings claim Frank Turner had given them before they executed the franchise agreement. It argues that, because justifiable reliance is an essential element of Mamilove's claims for fraud,[17] negligent misrepresentation,[18] and RICO violations,[19] Mamilove could not

---

[17] See *Jones v. Cartee*, 227 Ga. App. 401, 405 (2) (489 SE2d 141) (1997) ("The tort of fraud requires proof of five elements: (1) a false representation; (2) scienter; (3) intention to induce plaintiff to act or refrain from acting; (4) justifiable reliance by plaintiff; and (5) damage to plaintiff.") (citation omitted).

[18] See *Greenwald v. Odom*, 314 Ga. App. 46, 52 (723 SE2d 305) (2012) ("[N]egligent misrepresentation requires proof of (1) the defendant's negligent supply

prevail on those claims as a matter of law. Under the circumstances presented, we disagree.

(a) As we stated in Division 3, supra, "a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) rescind the contract and sue in tort for fraud." (Citations omitted.) *Jones v. Cartee*, 227 Ga. App. 401, 402-403 (1) (489 SE2d 141) (1997).

> Depending upon which of the two actions is ultimately pursued, the presence of a merger clause in the underlying contract may be determinative as to the successful outcome. If the defrauded party has not rescinded but has elected to affirm the contract, he is relegated to a recovery in contract and the merger clause will prevent his recovery. If, on the other hand, he does rescind the contract, the merger clause will not prevent his recovery under a tort [claim for fraud].

---

of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.") (citation and punctuation omitted).

[19] The RICO claim was based upon allegations that Legacy had committed at least two acts of racketeering activity, including, among other crimes, theft by deception. See OCGA § 16-8-3 (a), (b) (1) (theft by deception); OCGA § 16-14-3 (8) (A), (9) (A) (ix) (RICO Act); see also *First Data POS v. Willis*, 273 Ga. 792, 795 (2) (546 SE2d 781) (2001) (If a party cannot prove that it reasonably relied on a pre-contractual representation, then it also cannot prove that it was deceived by that representation. It follows that, absent proof of deception, the party cannot prevail on claims for theft by deception or a RICO claim based upon theft by deception.).

22

(Citations and punctuation omitted.) Id. at 403 (1).

In *City Dodge v. Gardner*, 232 Ga. 766 (208 SE2d 794) (1974), the Supreme Court of Georgia addressed whether a merger clause in a sales contract prevented a buyer from prevailing on his fraudulent inducement claim when the contract had been rescinded. In that case, the buyer asserted that, before he purchased a vehicle, the seller told him that the vehicle had never been wrecked. Id. at 767. The buyer signed a sales agreement that stated that the car was sold "as is" and contained the following merger clause: "no other agreement, promise or understanding of any kind pertaining to this purchase will be recognized." Id. After purchasing the car, the buyer discovered that it had been wrecked, so he tendered the car to the seller, unilaterally rescinded the contract, and filed a tort claim for fraud and deceit. Id. Following a jury verdict in favor of the buyer, the Supreme Court of Georgia directly addressed the legal issue of "whether the language of the merger clause . . . was legally effective to prevent the buyer from claiming that he relied on the seller's misrepresentation." Id. at 766-767. The Court held that

> the question of reliance on the alleged fraudulent misrepresentation in
> tort cases cannot be determined by the provisions of the contract sought
> to be rescinded but must be determined as a question of fact by the jury.
> It is inconsistent to apply a disclaimer provision of a contract in a tort

23

action brought to determine whether the entire contract is invalid because of alleged prior fraud which induced the execution of the contract. *If the contract is invalid because of the antecedent fraud, then the . . . provision[s] therein [are] ineffectual since, in legal contemplation, there is no contract between the parties*.

(Emphasis supplied.) Id. at 770.[20] In other words, a plaintiff can prevail on a claim for fraud in the inducement, even when the sales contract contains a merger clause, if the jury finds that the contract was invalid due to the seller's antecedent fraud. See id. ("[P]arol evidence of the alleged misrepresentation was admissible on the question of fraud and deceit. As the antecedent fraud was proven to the satisfaction of the jury, it vitiated the contract.").

Therefore, in the instant case, because the evidence supported the jury's verdict in favor of Mamilove on the rescission claim, as explained in Division 4, supra, the entire agreement – including the merger clause – was no longer valid or enforceable against Mamilove and did not prevent the Reymonds from proving that they

---

[20] See *Novare Group v. Sarif*, 290 Ga. at 190 (3) (The question of whether a party justifiably relied on a seller's antecedent misrepresentation "may be a jury question in a fraud case where no contract exists or *where the contract has become void*[.]" However, it is a question of law in a case where the contract remains valid and its provisions preclude reliance on oral representations.) (citations omitted; emphasis supplied).

24

reasonably relied on the fraudulent earnings claim when they executed the franchise agreement. See id.[21] Instead, it was for the jury to decide whether their reliance on the earnings claim was reasonable under the circumstances presented. See id. It follows that the trial court properly denied Legacy's motion for a directed verdict on Mamilove's claims for fraud, negligent misrepresentation, and RICO violations.

(b) Still, Legacy argues that the Reymonds could not prove the element of reasonable reliance as a matter of law because pre-contractual misrepresentations that contradict the express terms of a valid, written contract that contains a merger clause cannot be relied upon to vary the terms of that contract or to support a fraud claim.[22]

---

[21] Cf. *Novare Group v. Sarif*, 290 Ga. at 190 (3) (Because the purchasers did not prevail on their rescission claims, the contract remained valid, and the purchasers were bound to the contract's merger clause, which expressly stated that the purchasers could not rely on oral representations by the sellers. It followed that the purchasers could not prevail on their fraud and negligent misrepresentation claims, as those claims required a showing of justifiable reliance.).

We note that, to the extent that Legacy relies on an unpublished opinion by this Court in a previous appeal involving Legacy and a different franchisee, *Legacy Academy v. JLK, Inc.* (Case No. A13A0810, decided July 5, 2013), this Court issued that opinion pursuant to Court of Appeals Rule 36. Thus, pretermitting whether that appeal addressed this issue, Rule 36 specifically states that such opinions "have no precedential value."

[22] See *Novare Group v. Sarif*, 290 Ga. at 189 (2) ("Statements that directly contradict the terms of the agreement . . . cannot form the basis of a fraud claim[.]") (citation omitted); *Campbell v. Citizens & Southern Nat. Bank*, 202 Ga. App. 639, 640 (1) (415 SE2d 193) (1992) (Pre-contractual statements or agreements that

25

However, the misrepresentation at issue in this case – the fraudulent content of Legacy's earnings claim – did not contradict or vary the merger clause or any other provision of the agreement.[23] Thus, this argument does not support the grant of a directed verdict on these claims.

6. Legacy contends that the trial court erred in denying its motion for a directed verdict on Mamilove's claim for violation of a legal duty under OCGA § 51-1-6. Under OCGA § 51-1-6, "[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although

_____

contradict the express terms of a contract "cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud.") (citation omitted).

[23] Cf. *Novare Group v. Sarif*, 290 Ga. at 188-189 (2) (Although the sellers of high-rise condominiums told purchasers that the units would have "spectacular city views," the purchasers all signed written agreements that expressly stated that the views "may change over time.") (citation omitted)*; First Data POS v. Willis*, 273 Ga. at 794-796 (2) (Although the purchasers of a business told the sellers that they intended to increase the size of the business, thereby providing additional revenue to the sellers, the agreement stated that the purchasers could cease operations of the business entirely without notice to the sellers.); *Raysoni v. Payless Auto Deals*, 323 Ga. App. at 586-588 (1), (2), 589 (Although a salesman told a buyer that the car he was interested in purchasing had not been wrecked, the written sales contract stated that the car was being sold "AS-IS NO WARRANTY," that none of the salesman's statements were binding on the seller, and that the vehicle had been reported as damaged at auction.).

26

no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby."

Mamilove's claim under this statute was based upon Legacy's violations of the FTC Rules, specifically the FTC's Disclosure Requirements and Prohibitions Concerning Franchising, 16 CFR §§ 436.1 - 436.5. Under the FTC Rules,

> a franchisor must provide to prospective franchisees a complete and accurate basic disclosure document containing information relating to the franchisor and its existing franchisees. 16 CFR §§ 436.2-436.5.[24]

---

[24] The FTC Rules require, inter alia, that franchisors provide prospective franchisees with a copy of the current franchise circular and agreement "at least 14 calendar-days before the prospective franchisee signs a binding agreement with, or makes any payment to, the franchisor[.]" 16 CFR § 436.2 (a). The Rules also require that, if a franchisor provides a prospective franchisee "information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets," there must be "a reasonable basis for the information," and the information must be included in the disclosure documents provided at least 14 days before the agreement is executed. 16 CFR § 436.5 (s). Further, the Rules state as follows:

> If the franchisor makes any financial performance representation to prospective franchisees, the franchisor must have a reasonable basis and written substantiation for the representation at the time the representation is made and must state the representation in the Item 19 disclosure. The franchisor must also disclose the following: (i) Whether the representation is an historic financial performance representation about the franchise system's existing outlets, or a subset of those outlets, or is a forecast of the prospective franchisee's future financial performance. . . . (ii) If the representation relates to past performance of

27

> A franchisor's failure to disclose that information is an unfair or deceptive trade practice that violates § 5 of the Federal Trade Commission Act (FTCA). 16 CFR § 436.2; 15 USC § 45.

*Palermo Gelato v. Pino Gelato*, 2013 U. S. Dist. LEXIS 9931 (1), n. 2 (W.D. Penn. 2013).

On appeal, Legacy argues that 15 USC § 45 allows a franchisee, like Mamilove, to file a complaint with the FTC asserting a franchisor's alleged violations of the FTC Rules and that, if Mamilove had done so, the FTC could have filed a "cause of action" on Mamilove's behalf. Legacy contends that, because OCGA § 51-1-6 only applies when a "cause of action" is not available to the injured party, OCGA § 51-1-6 does not provide a remedy for Mamilove in this case.[25]

However, the phrase "cause of action" in the context of OCGA § 51-1-6 refers to an injured party's right to bring a *private* lawsuit. "OCGA § 51-1-6 authorizes a plaintiff to recover damages for the breach of a legal duty . . . when that duty arises

---

> the franchise system's existing outlets, the material bases for the representation[.]

16 CFR § 436.5 (s) (3).

[25] Legacy does not dispute that it owed a legal duty to Mamilove under the FTC Rules.

28

from a statute that does not provide a *private* cause of action." (Citation and punctuation omitted; emphasis supplied.) *Pulte Home Corp. v. Simerly*, 322 Ga. App. 699, 705 (3) (746 SE2d 173) (2013). The plain language of 15 USC § 45 clearly shows that the statute does not provide a private cause of action. Instead, the statute provides that, if the FTC believes that a franchisor has intentionally violated its rules against unfair or deceptive acts, it will conduct a "hearing."[26] Then, if it finds a violation, it will issue a cease and desist order.[27] If the FTC subsequently finds that the franchisor has violated the cease and desist order, it may issue, at most, a civil penalty to be paid to the United States, not to the injured party.[28] Thus, there is no

---

[26] See 15 USC § 45 (b) ("Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any . . . unfair or deceptive act or practice in or affecting commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing[.] . . . If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by this Act, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice.").

[27] Id.

[28] See 15 USC § 45 (l) ("Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in

merit to Legacy's contention that the FTC could have filed a cause of action on behalf of Mamilove.[29]

Accordingly, we conclude that Mamilove was entitled to pursue a claim under OCGA § 51-1-6 based upon Legacy's violations of the FTC Rules. See *Holiday Hospitality Franchising v. 174 West Street Corp.*, 2006 U. S. Dist. LEXIS 49177 (III) (A) (2) (N.D. Ga. 2006).[30] It follows that, because there was evidence to support the

___

effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States."); see also 15 USC § 45 (m) (1) (A) ("The Commission may commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this Act respecting unfair or deceptive acts or practices . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule. In such action, such person, partnership, or corporation shall be liable for a civil penalty of not more than $10,000 for each violation.").

[29] Moreover, the federal courts have repeatedly ruled that the FTC's franchise disclosure rules, 16 CFR §§ 436.2-436.5, "do not create a private right of action." (Citations omitted.) *Holiday Hospitality Franchising v. 174 West Street Corp.*, 2006 U. S. Dist. LEXIS 49177 (III) (A) (2) (N.D. Ga. 2006). See, e.g., *Bans Pasta v. Mirko Franchising*, 2014 Dist. LEXIS 19953 (W.D. Va. 2014) ("[N]either the FTC Act nor [16 CFR § 436.5] gives rise to a private cause of action, and numerous courts have so held."); *Palermo Gelato v. Pino Gelato*, 2013 U. S. Dist. LEXIS 9931 (II) (W.D. Penn. 2013) ("It is well settled that [16 CFR § 436.5] may only be enforced by the FTC, and does not create a private cause of action.") (citations omitted).

[30] See generally *Pulte Home Corp. v. Simerly*, 322 Ga. App. at 705 (3) (This Court concluded that the duties imposed by Georgia's water quality statutes and the

jury's verdict against Legacy on that claim, the trial court did not err in denying Legacy's motion for a directed verdict thereon.

7. Legacy contends that the trial court erred in denying its motion for a directed verdict on its counterclaim for breach of contract based upon Mamilove's failure to pay royalty and advertising fees to Legacy after the Reymonds discovered Legacy's fraud and terminated the franchise agreement in 2010. However, because the jury found that the franchise agreement was rescinded due to Legacy's antecedent fraud, as discussed in Division 4, supra, no contractual fee obligation survived for Mamilove to breach. See *City Dodge v. Gardner*, 232 Ga. at 770 (Because the evidence supported the jury's conclusion that the entire contract was invalid due to the defendant's antecedent fraud, the defendant could not rely on the contract's provisions, as they had no legal effect.).

Moreover, even if Mamilove had been obligated to pay such fees to Legacy after terminating the agreement, Legacy failed to produce any evidence at trial to

federal Clean Water Act, 33 USC prec. §1251 et seq., fall within the ambit of OCGA § 51-1-6.); *Cardin v. Telfair Acres of Lowndes County*, 195 Ga. App. 449, 450 (393 SE2d 731) (1990) (This Court concluded that the regulations of the federal Occupational and Safety Health Administration constituted an enforceable duty under the law, and a breach of those regulations was a violation of law. Thus, the regulations were admissible as evidence of an employer's legal duty, the violation of which may give a cause of action under OCGA § 51-1-6.).

prove the amount of fees Mamilove failed to pay, instead relying on a purely speculative estimate of the franchise's possible revenue for the remainder of the contract period. "Damages must be proved by evidence which furnishes the jury with sufficient data to enable them to calculate the amount with reasonable certainty. Proof of damages cannot be left to speculation, conjecture and guesswork." (Citation and punctuation omitted.) *Olagbegi v. Hutto*, 320 Ga. App. 436, 439-440 (2) (740 SE2d 190) (2013). Accordingly, this alleged error lacks merit.

8. Legacy contends that the trial court erred in denying its motion for a directed verdict on Melissa Turner's individual liability for Mamilove's claims. Because there was evidence presented at trial to support the jury's finding on Melissa Turner's individual culpability for Mamilove's claims, and because Legacy has failed to cite to any evidence or authority to demand a contrary finding, the trial court did not err in refusing to direct a verdict on this factual issue. See *Fertility Technology Resources v. Lifetek Med.*, 282 Ga. App. at 149; *Rolleston v. Estate of Sims*, 253 Ga. App. at 185 (4); *Stubbs v. Harmon*, 226 Ga. App. at 632 (1).

9. Legacy contends that the trial court abused its discretion in excluding the tax returns of one of its other franchisees, JLK, Inc. and JLK Holdings, Inc. The trial court excluded the evidence after concluding that it constituted hearsay. Legacy has

32

failed to cite to any evidence or authority to show that this conclusion was erroneous and that, as a result, the court abused its discretion in excluding admissible evidence.[31] Accordingly, this alleged error is deemed abandoned. See Court of Appeals Rule 25 (c) (2).

10. Legacy contends that the trial court abused its discretion in excluding the tax returns of a separate business, The Cutting Board, Inc., that was owned solely by Lorraine Reymond. The trial court excluded the evidence on the basis that it was irrelevant to the issues presented at trial. Because Legacy failed to tender the evidence at trial and has not cited to any authority on appeal to support this alleged error, this argument is deemed abandoned. See Court of Appeals Rule 25 (c) (2).

11. Legacy contends that the trial court abused its discretion in denying its motion for a new trial.[32] According to the motion, Michele Reymond allegedly committed perjury during the trial when she testified that she did not have an

---

[31] See *Carter v. State*, 296 Ga. App. 598, 601, n. 7 (675 SE2d 320) (2009) (This Court reviews a trial court's ruling on the admission of evidence under an abuse of discretion standard.).

[32] See *Hopper v. M&B Builders*, 261 Ga. App. 702, 705 (1) (b) (583 SE2d 533) (2003) ("When a trial judge decides not to grant a new trial, he becomes the trier of fact, and his discretion in refusing the motion will not be disturbed unless manifestly abused.") (footnote omitted).

opportunity to review the franchise circular and agreement prior to signing them. In support of the motion, Legacy claimed that it had a copy of the circular and agreement on which Reymond had made handwritten notes, thus proving that she had thoroughly reviewed the documents before signing them.

Under OCGA § 5-5-23, the trial court is authorized to grant a new trial "in any case where any material evidence, not merely cumulative or impeaching in its character but relating to new and material facts, is discovered by the applicant after the rendition of a verdict against him and is brought to the notice of the court within the time allowed by law for entertaining a motion for a new trial."

> Grants of new trial on the ground of newly discovered evidence are not favored and are addressed to the sound discretion of the trial court. The trial court's decision will not be disturbed absent a manifest abuse of discretion. To obtain a new trial based on newly discovered evidence, the evidence supporting the motion must satisfy six criteria: (1) it must have been discovered after the trial or hearing; (2) its late discovery was not due to lack of diligence; (3) it is so material that its introduction in evidence would probably produce a different result; (4) it is not merely cumulative; (5) the affidavit of the witness must be attached to the motion (or its absence accounted for); and (6) it does not operate only to impeach a witness. All six criteria must be satisfied for a new trial to be warranted.

(Footnotes omitted.) *Hopper v. M&B Builders*, 261 Ga. App. 702, 704 (1) (b) (583 SE2d 533) (2003).

In this case, in arguing that Reymond had lied during her trial testimony as to when she received the circular and agreement from Legacy, Legacy is relying on copies of the documents that, by its own admissions, it possessed prior to and during trial. Thus, the documents are not newly discovered evidence that might, under certain circumstances, authorize the grant of a new trial. Further, even if the documents had been newly discovered evidence, their only purpose would be to impeach Reymond's testimony as to when she received the documents from Legacy.[33] Because even newly discovered evidence that merely serves to impeach a trial witness' testimony does not authorize the grant of a new trial under OCGA § 5-5-23, the trial court did not abuse its discretion in denying Legacy's motion. *Hopper v. M&B Builders*, 261 Ga. App. at 704 (1) (b).

*Judgment affirmed. Phipps, C. J., Barnes, P. J., and McFadden, J., concur. Andrews, P. J., Ray and McMillian, JJ., dissent.*

---

[33] See OCGA § 24-6-621 ("A witness may be impeached by disproving the facts testified to by the witness.").

35

A14A0718. LEGACY ACADEMY, INC. et al. v. MAMILOVE,

    LLC et al.

MCMILLIAN, Judge, concurring in part and dissenting in part.

For the reasons set forth below, I must respectfully dissent to Division 4 and Division 5 of the majority opinion.

1. Contrary to the majority's holding in Division 4, Legacy was entitled to a directed verdict on Mamilove's claim for rescission of the franchise agreement.

As the majority states, it is undisputed in this case that Michele Reymond and Lorraine Reymond did not read the franchise agreement prior to signing. Further, as the majority acknowledges, it is "well-settled law in Georgia that a party who has the capacity and opportunity to read a written contract cannot afterwards set up fraud in the procurement of [the contract] based on . . . representations that differ from the terms of the contract." (Citation and punctuation omitted.) *Novare Group v. Sarif*, 290 Ga. 186, 188-189 (2) (718 SE2d 304) (2011). Nevertheless, the majority concludes

that Mamilove is entitled to rescind the franchise agreement despite the Reymonds' failure to read it because the jury was authorized to find that they were "pressured" or "rushed" into signing it.

But being pressured or rushed into signing an agreement does not provide a legal excuse for not reading the agreement. As the Supreme Court also explained in *Novare*, "[i]n fact, the only type of fraud that can relieve a party of his obligation to read a written contract and be bound by its terms is a fraud that *prevents* the party from reading the contract. . . . To be able to rescind a contract, the fraud must be of a nature that the [party seeking to rescind the contract was] deprived of an opportunity to read the agreements." (Emphasis supplied.) Id. at 189 (2). In this case, although the Reymonds set out evidence that the Turners "rushed" or "pressured" them into signing the agreement "right then" by telling them they would lose the franchise opportunity if they did not act, they presented no evidence that the Turners said or did anything that prevented them from reading the agreement before they signed it. *Citizens Bank, Vienna v. Bowen*, 169 Ga. App. 896, 897 (1) (315 SE2d 437) (1984) (the fact that one party was in a "hurry" to have the agreements signed does not mean the other party was prevented from reading it); see also *Tidwell v. Critz*, 248 Ga. 201, 203 (1) (282 SE2d 104) (1981) ("threat of losing a job or fear of such loss

2

not duress which will void a contract"); *Citicorp Indus. Credit v. Rountree*, 185 Ga. App. 417, 420 (1) (364 SE2d 65) (1987) ("[t]he fact that appellees deemed themselves too busy to read the . . . agreements prior to signing them will not authorize them to avoid their obligations"); *Bradley v. Swift & Co.*, 93 Ga. App. 847, 856 (3) (93 SE2d 364) (1956) (being occupied with other business does not mean party was fraudulently induced to sign).

Thus, Mamilove was bound by the terms of the franchise agreement, which contained a merger clause and disclaimers[1] that it had not received any

---

[1] Paragraph 24.2 of the franchise agreement provides:

*No Representations, Warranties or Guarantees*. Franchisor expressly disclaims the making of, and Franchisee and each Owner acknowledge that it has not received from Franchisor or any party on behalf of Franchisor, any representation, warranty or guarantee, express or implied, as to the potential volume, profit, income or success of the business licensed under this Agreement.

Paragraph 24.7 provides:

*No Earnings Claims*. Franchisee acknowledges that neither Franchisor, nor any person on behalf of Franchisor, has made any written, oral or visual representation of (i) earnings capability of Legacy Academy Center; (ii) a specific level of potential sales, income, gross or net profit

representations concerning potential income or earnings claims prior to signing the agreement. Accordingly, Mamilove could not rescind the agreement based upon allegations that they were fraudulently induced to enter into the agreement based on a false earnings spreadsheet, and the trial court should have granted Legacy's motion for directed verdict on this claim. *Novare*, 290 Ga. at 189 (2) ("[p]urchasers are not entitled to back out of a written agreement whose terms expressly contradict the oral representations on which Purchasers claim to have relied."); *Campbell v. Citizens & Southern Nat. Bank*, 202 Ga. App. 639, 640 (1) (415 SE2d 193) (1992) (party not prevented from reading the contract cannot claim he was fraudulently induced to sign by promises which contradict the contract terms).

---

for the Franchisee; or (iii) a specific level of sales, income, gross or net profits of existing centers (whether franchised or company-owned) other than as specifically described in the Offering Circular.

The merger clause was contained in paragraph 24.6 and provides:

*Entire Agreement.* Franchisee acknowledges that this agreement constitutes the entire agreement of the parties with respect to the matters contained herein. This Agreement terminates and supersedes any prior agreement between the parties concerning the same subject matter.

4

2. Because Mamilove was not entitled to rescind the agreement, I also disagree with the majority's conclusion in Division 5 that the disclaimers and merger clause contained in the agreement were ineffectual. In other words, because Mamilove "[was] not entitled to rescission as a remedy, they are bound by the terms of their [agreement]." *Novare*, 290 Ga. at 190 (3). Cf. *City Dodge, Inc. v. Gardner*, 232 Ga. 766 (208 SE2d 794) (1974). These provisions precluded the Reymonds' claim that they reasonably relied on or were deceived by the earnings spreadsheet when they executed the franchise agreement. Accordingly, the trial court should have granted Legacy's motion for directed verdict on Mamilove's claims for fraud, negligent misrepresentation, and RICO violations. *Novare*, 290 Ga. at 190 (3) ("Since Purchasers are estopped from relying on a representation outside of the agreement, they cannot sustain any of the causes of action that require justifiable reliance."); *First Data POS, Inc. v. Willis*, 273 Ga. 792, 796 (2) (546 SE2d 781) (2001) ("merger clause . . . precludes any subsequent claim of deceit based upon pre-contractual representations."); *W. R. Grace & Co.-Conn. v. Taco Tico Acquisition Corp.*, 216 Ga. App. 423, 426 (1) (454 SE2d 789) (1995) ("[t]his [C]ourt has consistently held that disclaimers in contracts prevent justifiable reliance on other representations purportedly made by the parties.").

5

3. Mamilove argues, however, that even if we were to decide that it was not entitled to rescind the franchise agreement and accordingly it was bound by its terms, we nevertheless must sustain the jury's verdict as long as the verdict in its favor on its other claims remains extant. But as our Supreme Court explained in *Georgia Power Co. v. Busbin*, 242 Ga. 612, 616-617 (8) (250 SE2d 442) (1978), "the [general] verdict[2] cannot stand for the reason that this court cannot determine whether the verdict was entered upon a proper basis." See also *Godwin v. Godwin*, 265 Ga. 891, 892 (1) (463 SE2d 685) (1995). Accordingly, I believe that Legacy must be granted a new trial on its other claims, including their negligence claim under OCGA § 51-1-6.[3]

I am authorized to state that Presiding Judge Andrews and Judge Ray join in this opinion.

---

[2] The verdict form was general as to liability for the claims asserted.

[3] I concur with the majority's conclusion in Division 1 that Legacy waived the statute of limitation defense as to this claim.